[Civ. No. 22414.   Second Dist., Div. Two.   Oct. 16, 1957.]

Guardianship of the Person and Estate of KATHLEEN BROCK, a Minor.   KATHLEEN DALY REED, Appellant, v. ROSEMARY BROCK, Respondent.

Voorhees, Stewart & Voorhees and Hill, Farrer & Burrill and William S. Scully for Appellant.

Hahn, Ross & Saunders for Respondent.

ASHBURN, J.—Appeal from order revoking letters of guardianship of person and estate of Kathleen Brock, a minor 9½ years of age at the time of the appointment. The guardian-appellant is Kathleen Daly Reed, maternal grandmother of the child. The mother, Rosemary Brock, is respondent.

On January 19, 1956, upon application of Mrs. Reed, the court appointed her as such guardian. The petition alleged that the parents were divorced and the father married to another woman but living with his former wife Rosemary. Also: ''That the mother of said minor has conducted herself with other men, in the presence of said minor child, in such a manner as to contribute to the delinquency of said child; that the mother of said minor is not a fit and proper person to have the care, custody and control of said minor child.'' The parents answered the petition but later withdrew their objections and did not appear at the hearing. Evidence having been taken, the court made the appointment upon the expressed ground that both parents ''are unfit.''

On August 3, 1956, less than seven months after that appointment, said parents filed a petition for termination of the guardianship[1] alleging that circumstances had changed in that the parents had remarried and established a home wherein they could care for and bring up said child; that they ''are now living a respectable life and can provide said minor child with living conditions of a high standard''; that it was no longer necessary that the ward be under guardianship. After a contested hearing had in December, 1956, the court found: ''That petitioner, ROSEMARY BROCK, mother of the minor herein, is at the present time a fit and proper person to have the care, custody and control of said minor child. . . . That it is for the best interest and welfare of said minor child that the Letters of Guardianship of the person

---

[1]The father, Paul T. Brock, joined in the petition but before the hearing filed a formal withdrawal as petitioner.

of said minor child heretofore granted to KATHLEEN DALY REED be revoked.'' On that basis Mrs. Reed's letters of guardianship were revoked.

By stipulation a probation officer's report upon this matter was received and considered as evidence; there was also oral evidence produced by both sides to the controversy.

■ The respondent relies upon the broad discretion of the court pertaining to these matters. ''The Probate Court retains a continuing, supervisory jurisdiction over the affairs of the estate and the guardian's handling thereof, and the removal of a guardian for the reasons specified in the code rests within the broad discretion of that court.'' (*Guardianship of Russell*, 21 Cal.2d 767, 772 [135 P.2d 369].) Appellant rightly insists that it is a judicial discretion which must be exercised in accordance with established legal principles (see *Johnson* v. *Johnson*, 72 Cal.App.2d 721, 725 [165 P.2d 552]), and that so viewed the findings and order are not supported by sufficient or any substantial evidence.

Section 1580, Probate Code, prescribes the grounds for removal of a guardian. Subdivision (8) states the only ground which could apply to this case: ''When it is no longer necessary that the ward should be under guardianship.'' ■ Section 1580 is exclusive in its operation. ''The causes for removal of a guardian are stated in section 1580 of the Probate Code. ■ The fact that one had a preferred right to be appointed is not a cause for removal of another who has been duly appointed. ■ A guardian may not be removed for a cause other than those stated in section 1580.'' (*Estate of Walsh*, 114 Cal.App.2d 82, 84 [249 P.2d 578].)

■ The burden rests upon the moving party to establish that the guardianship is no longer necessary and this involves a showing of a change of circumstances subsequent to the order of appointment of guardian; where that order is based upon unfitness of the parent the proof must encompass an affirmative showing of a rehabilitation of that parent. Bearing in mind the rule that the same principles are applicable to this proceeding as to one for modification of a custody order in a divorce case (*Guardianship of Boulad*, 90 Cal.App.2d 135, 138 [202 P.2d 562]), the language of *Johnson* v. *Johnson*, *supra*, 72 Cal.App.2d 721, 723, becomes pertinent: ''To justify a modification of an order for custody of a minor child there must be a change of circumstances arising after the original decree was entered (*Olson* v. *Olson*, 95 Cal.App. 594, 597 [272 P. 1113]; *Foster* v. *Foster*, 8 Cal.2d 719, 726 [68 P.2d

719]), and until a change of circumstances occurs which makes a modification of the former custodial order advisable from the consideration of the welfare of the child, the court will refuse to make any modification thereof. (*In re Inman,* 32 Cal.App.2d 130, 134 [89 P.2d 421]; *Washburn* v. *Washburn,* 49 Cal.App.2d 581, 587 [122 P.2d 96].) On an application to modify an order for custody the court proceeds on new facts considered in connection with those formerly established. . . . All presumptions are in favor of the reasonableness of the original decree and the burden was on respondent to prove that conditions had so changed as to justify the modification of the order for custody. (*Gavel* v. *Gavel,* 123 Cal.App. 589, 591 [11 P.2d 654]; *Prouty* v. *Prouty,* 16 Cal.2d 190, 193 [105 P.2d 295].) The right of custody in appellant having been determined by the interlocutory decree, which found in effect that he was a fit and proper person to have custody, the order cannot be modified without a showing that he is no longer fit.'' While the rule of changed circumstances is not one of universal application (see *Foster* v. *Foster,* 8 Cal.2d 719, 728 [68 P.2d 719]), we find here, as did the court in *Stagliano* v. *Stagliano,* 125 Cal.App.2d 343, 348 [270 P.2d 91] : ''The present case does not present an exception to the general rule that there must be a change of circumstances. The burden was upon defendant herein to prove that circumstances or conditions had changed so as to justify his requested modification of the order for custody. (*Johnson* v. *Johnson, supra,* p. 724.) He had the burden of proving that such a modification would be for the best interest of the child, or at least to prove that such a modification would not be detrimental to her welfare.'' This the respondent did not do.

It affirmatively appeared that the child's parents had again separated after filing their petition for termination of guardianship, that they were not maintaining a home together; the father withdrew from the application and the issue was reduced to the question of whether the mother, adjudged unfit in January, 1956, had graduated into fitness at the time of the hearing on December 10, 1956. Her unfitness for custody in January had been conclusively adjudged by the finding and order of that date, which had become final.

Respondent's counsel presented the matter as if it were a question of fitness for an original appointment and most of the evidence was directed to occurrences prior to appointment of Mrs. Reed as guardian. The probation officer's report quotes a maternal great-aunt of the child as follows: ''Mrs. Kowal states that Mrs. Brock's habits, since she has been

adult, are certainly not those that would make a good mother, that she stays up all night and sleeps all day, that she has never earned an honest living, as far as she knows, since she has been in California, that her attitude toward life is that only dopes and stupid people work for a living. She states that the mother associates with gamblers and makes no bones about being a 'kept' woman. On one occasion when she was in Los Angeles, the mother told her to stop by and see her late at night. When Mrs. Kowal returned to the mother's home, the door was locked and the child had been locked in the apartment, alone.'' A maternal aunt, Mrs. Holiday, said: ''[T]hat Mrs. Brock's moral standards are very low, that she has never been known to work and prides herself on this, that she is the type of person who is only interested in obtaining her personal wishes and will stop at nothing, to get her way.'' Again: ''Mrs. Holiday states that several years ago, her sister, Mrs. Brock, brought one of her children with Kathy to California from Oklahoma, for a visit. Without warning, the children were returned to Oklahoma, by plane. It developed that Mrs. Brock had to leave her apartment without notice, when the wife of the married man with whom she was associating at the time, located the couple in her apartment.''

The child (commonly called Kathy) and other witnesses related incidents pointing to respondent's unfitness. The little girl told of going to Twenty Nine Palms with her mother and one Bradley. She was required to sleep in the automobile while Bradley and the mother slept in the trailer. In the early morning she was cold, went into the trailer where the two were in bed, but was scolded and sent back to the automobile. The probation officer's report says: ''On one occasion, Kathy woke up in the night, when she was about nine years old. She had had a bad dream and cried out. Her mother came into the bedroom, nude, and whipped her for crying and disturbing people. The mother returned to the living room, where she was sleeping. Kenneth Bradley was sleeping on the pull-down bed in the living room with the mother. In the morning when he got up, he passed the bedroom door where Kathy was, on the way to the bathroom, nude.'' When living with her mother Kathy would take gin and whiskey bottles to the store and sell them for two cents each.

Evidence such as the foregoing presented clear basis for the previous finding of unfitness, a background requiring a definite showing of a reformed way of life.

Mrs. Brock denied that Bradley had ever stayed overnight with her or that she had ever misconducted herself with him, but her showing of changed circumstances was attenuated indeed. It consisted of the following: At the time of the hearing she had an apartment with furniture of her own including twin beds, and a job which she considers permanent, paying $50 a week, the work being performed by use of the telephone at home; she had had that work for only two weeks; from September, 1956, when she separated from Paul T. Brock, until two weeks before the trial she had not worked at all. Brock was giving her $200 a month and declared his willingness to continue to do so but he was under no court order and had two other families to support.

In March, 1956, after appointment of Mrs. Reed as guardian, the child was with her at her home in Oklahoma. Respondent asked to take her to Santa Barbara, saying she would bring her back. Having obtained such consent, respondent and the child disappeared, and Mrs. Reed, though she employed a detective, could not locate them until Kathy called her by long distance telephone from Arcadia, California, whereupon the grandmother flew to California and took the child back to her own home in Oklahoma.

The probation officer's report says: "She [Kathy] is emphatic in her wish to remain with her grandmother. She is quite mature and objective in her point of view. She feels that her interests are with the grandmother. She feels her mother has never acted as a mother toward her."

By stipulation the court interviewed the child in chambers. She there said she did not get along with her mother. That "sometimes she doesn't live right, you might say." "I don't want her to get me. Q. How do you know? Maybe you might get along very well with your mother now. A. Well, I lived with her. I lived with her enough to know that I'm not going to." When the judge told her she would have to live with her mother for a while "the child started to cry," according to the reporter's transcript. That morning, when respondent saw her at court and tried to talk to her she hung her head and turned away. The probation officer states that even before appointment of a guardian Kathy felt neglected and unloved by her mother due to the mother's "outside interests."

There was nothing of substantiality to support a finding of changed or other circumstances which would warrant a termination of the guardianship upon the theory that respondent, unfit on January 19th, had become a fit custodian by

December 10th of the same year. The court does not have power to administer justice *ex gratia* in guardianship matters. Immediately after announcing the findings that respondent is a fit and proper person to have custody and that it is for the child's best interest that the guardianship be terminated, the court made some explanatory remarks, as follows: "Now, I will go this far and indicate that the information set forth in the Probation report, and some' of the evidence that was presented here, would indicate that in the past Mrs. Brock was probably an unfit person to have the care of the daughter. Mrs. Brock is going to have to watch herself. I mean that means you are going to have to watch your conduct. I am not saying you can't drink, but I am saying you have got to stay within reasonable limits. And you can't entertain men friends and have them stay overnight and in the apartment. I am just making a few passing remarks, and you know yourself the things that you should not do around a little girl. So you are just going to have to watch yourself. But as I indicated a moment ago, I feel at the present time, based on the testimony I have before me, that it appears Mrs. Brock is a fit person. So, watch your associates and watch your own conduct. . . . MR. VOORHEES: If your Honor please, I have seen these situations where these mothers don't care for the children; where the grandparents do have to step in and do it. THE COURT: I will say this: You have got a situation that you are going to have to have a break sooner or later; as soon as the mother reaches the point where she is going to be a fit person you are going to have that problem." Appellant says that these observations render *Matter of Lee,* 165 Cal. 279 [131 P. 749, 45 L.R.A.N.S. 91] here pertinent, and we are constrained to agree. The Supreme Court said in that case, at page 281: "This judgment, however in consonance with the code of ethics, is not a judgment countenanced by the code of this state. Section 246 of the Civil Code limits the discretion of the court and declares that that discretion shall be exercised in favor of 'what appears to be for the best interest of the child in respect to its temporal and its mental and moral welfare.' Here the judge seeks to use the infant child of a mother whom he finds to be dissolute and immoral for the purpose of reforming that mother. In other words, the court takes this infant away from a safe and loving shelter in the care of its aunt who is devoted to it to subject it to the doubtful experiment of seeing whether its presence may work the mother's reformation. While the ex-

periment is at least doubtful, it is not doubtful that the law does not countenance such an award and, that in the event of failure, the experiment cannot be other than disastrous to the child whose welfare, and not that of the mother, is to control the award."

Order reversed.

Moore, P. J., and Fox, J., concurred.