[Civ. No. 31606.   Second Dist., Div. One.   Aug. 22, 1967.]

Guardianship of JULIE ELLEN DAVIS, a Minor. JOAN M. DAVIS, Petitioner and Appellant, v. MABEL DAVIS, Petitioner and Respondent; LEE ALLEN DAVIS, Objector and Respondent.

Rosenfield & Rosenfield and Jerome D. Rosenfield for Petitioner and Appellant.

R. Norman Wenzell for Petitioner and Respondent.

Lee Allen Davis, in pro. per., for Objector and Respondent.

LILLIE, J.—Joan Barr, natural mother of the minor, Julie Davis, appeals from order dated March 28, 1966, denying her petition to terminate guardianship (previously granted to Mabel Davis, no relation to Julie) and her order to show cause for custody of Julie; and granting the guardian's order to show cause re modification of order re visitation rights of Joan and Lee Davis (the natural father).

The following history of the within litigation presents a complex parental situation in the life of an 11-year-old child. Joan, 19 years old, married Lee Davis on June 21, 1953; Julie was born May 30, 1956. Joan separated from Lee in January 1957 and on April 1, 1957, Joan surrendered Julie, then 10 months old, to Vista Del Mar Child Care Service for foster home placement. On April 25, 1957, Joan was granted an

interlocutory decree of divorce and custody of Julie, although Julie remained in a foster home.

During 1958 Joan married Jose Toledo; Lee married Mabel Peters (Mabel Davis, guardian and respondent herein). Joan and Jose had two children. In July 1959, Julie, then a little over three years old, was taken from the foster home by Lee and Mabel to live with them; on February 2, 1960, with Joan's written consent, the sole custody of Julie was awarded to Lee subject to reasonable visitation by Joan who "shall exercise such right of reasonable visitation in the residence of [Lee], and shall not be permitted to have physical custody of the minor child." Julie lived with Lee and Mabel from July 1959 until Lee and Mabel separated in April 1963; thereafter Julie continued to live with Mabel with the specific permission and consent of Lee. During 1962 Joan divorced Jose and on October 12, 1963, married William Barr, her present husband; a child was born September 12, 1964. Mabel obtained a final decree of divorce October 22, 1965; thereafter Lee married Carol, his present wife. Mabel has not remarried.

From July 1959, when Julie (then three years old) came to live with Lee and Mabel, to the present time, Mabel has raised Julie as her own natural child, and a relationship of mother and child has been established between them. From April 1957, when Joan surrendered Julie (then 10 months old) to the Vista Del Mar Child Care Service for foster home placement, until February 1961, Joan neither contacted nor visited Julie; from February 1961 to February 1962 on a few occasions Joan visited Julie at Lee's residence; from February 1962 until January 1965, Joan made no attempt to either contact or visit Julie. Then during January 1965, Joan filed an order to show cause for a change of Julie's custody from Lee to her. On February 4, 1965, Mabel filed a petition for guardianship in the probate court (§ 1400, Prob. Code) on the ground that Lee and Joan had in effect abandoned Julie. All matters were consolidated for hearing. Numerous witnesses were called and the trial judge interviewed Julie in chambers in the presence of counsel. Julie told the judge she loved Mabel and preferred to remain in her custody, and preferred visitation with Lee and her grandmother; the judge told Julie she would have to visit her mother and father "though she was reluctant about these visitation rights . . . and wasn't happy about this." In an amended order (March 29, 1965) appointing Mabel guardian of Julie *nunc pro tunc* as of March 16, 1965, the court specifically found that Joan's

conduct "in effect has constituted abandonment" of Julie for a period of approximately eight years, that Lee at this time is unfit to have Julie's custody and that Julie has indicated her desire to live with Mabel; granted Lee and Joan reasonable visitation rights; and specifically instructed Mabel to bring up Julie in the Jewish faith. No appeal has ever been taken from this order and the same has become final.

Thereafter, conflict arose over visitation rights; on June 10, 1965, the trial court made an order delineating the visitation rights of the natural parents. Under this order Julie was "aways packing to go to someone's home" and was unhappy with the arrangement; thus, on October 13, 1965, by order to show cause Mabel sought some curtailment of the visitation under the June 10, 1965, order on the ground that the extensive visitation rights exercised by her mother and father gave Julie no time at home, interfered with her normal living and was physically tiring and emotionally upsetting to Julie. On November 19, 1965, Joan countered by filing a petition for termination of the guardianship, and an order to show cause for transfer of Julie's custody to her. The petition and orders to show cause were consolidated for hearing.

On the first day of the hearing the judge dismissed Joan's petition on the ground that it was an attempt "to relitigate the entire matter all over again" only nine months after the order appointing Mabel guardian. After extensive discussion of visitation rights, the judge expressed his intention to "interview the child in chambers" or "have a court investigator interview" Julie, whereupon Joan's counsel requested the appointment of an investigator "for the whole matter, the question of custody." The judge reversed his ruling dismissing Joan's petition, continued the hearing to March 25, 1966, and appointed an investigator, Lawrence McNally.

The investigator's report, unfavorable to Joan and Lee, in effect recommended that Julie remain with Mabel. The judge read the report, various declarations on file, certain affidavits and all memoranda. On March 25, 1966, five witnesses were further questioned by Joan's counsel—Lee (whose opinion that Joan is fit to take care of Julie was contrary to his sworn testimony in the guardianship proceeding), Lee's father (who also changed his testimony concerning Joan), a case worker for Vista Del Mar, Joan's husband and Joan. These persons, with others, had been interviewed by the investigator. Generally, their testimony was to the effect that Joan had a good

home, had returned to the Jewish faith and was fit to care for Julie.

The investigator also talked to Julie, Mabel, a sitter, the school principal, Julie's Bluebird leader, persons who know Julie and Mabel and the home, and Mr. Brodsky, a certified psychologist. Mr. Brodsky reported that Julie always referred to Mabel as "mother" and feels secure and comfortable with her; adjusting anew to a stepfather and living with Joan and her younger children would create a "problem situation" and complicate matters for her considerably; being the center of a struggle for her custody has been a problem to Julie, although she was certain she wanted to stay with Mabel; and Julie's progress in school, her interest in her peer group and her future plans are indicators for her feeling comfortable and secure with Mabel. Mabel Davis is employed Tuesday through Saturday; her residence is a small but adequate, attractively furnished and well-maintained two-bedroom home situated in an established residential area, kept by excellent housekeeping standards; Julie has her own room; residing in the home is Mabel's mother, age 58. A sitter, Mrs. Shiffman, age 56, is employed by Mabel to supervise Julie's activities from the time she gets out of school (3 p.m.) until Mabel returns from her place of employment (5 p.m.). Mrs. Weisman, Julie's Bluebird leader for two years stated that in view of the close relationship between Julie and Mabel she was surprised to learn that Mabel was not her mother. Julie's school principal described "excellent parent cooperation with Mrs. Mabel Davis" and said Julie was enthusiastic, dependable, well behaved and had good working habits, and that her class achievement and classroom habits and attitudes are above average. Mr. McNally (investigator) interviewed Julie twice—first, during an unannounced visit to her home, then at his office by appointment. He reported that on both occasions Julie appeared exceptionally clean, well dressed and in excellent health; she stated with "forceful, verbal emphasis" that she wanted to remain with Mabel and pleaded with him to tell the judge to stop making her "keep coming back to court"; she said she liked it the way it was before when her mother and father would call and invite her out for something special, she didn't want to *have to* go as she might be doing something and she tried to make them understand this but it is hard for her to tell them; Julie told of Mabel's efforts to send her to religious school and how "we attend Temple together"; at the time of Joan and Lee's divorce (April 25,

1957) and for the most part since, until rather recently, ''in apparent contradiction of their present interest in the child,'' they delegated more and more of their parenthood so that very little is left of a direct relationship between parent and child; obviously absent in this situation is a verbal explanation for separation of child and natural parents ''confirmed by continued evidence of the parents' love for the child in visits, in letters, and other expressions of warmth and affection''; Julie's present home with Mabel is conducive to the continuing contribution of those values of home life that are so important for the healthy growth of the child physically, emotionally and socially; Mabel appears to be ''a very concerned parent'' possessed of a singular ambition for Julie, is sincere in her desire to be a ''responsible parent'' and is actively participating in a responsible manner in the care of the child; Julie expressed a preference to remain with Mabel and she is of sufficient intelligence to be able to evidence selectivity; Julie resents openly that she is the center of a conflict and is anxious to have it resolved and says the present visitation arrangement is quite unsatisfactory to her. The last paragraph of the report carries the implication that the natural parents are not now capable of ''relating constructively to the child.''

On March 28, 1966, the court made its order denying Joan's petition to terminate guardianship and her order to show cause for change of custody; and, finding (on Mabel's order to show cause) that Joan and Lee ''have wilfully failed and refused to heed the previous admonitions of the court concerning annoying and harrassing the minor child when exercising the visitation rights'' under the June 10, 1965, order which has resulted in disturbing Julie emotionally, and that ''a continuation of the present visitation rights will result in serious emotional instability of the minor child,'' vacated the order of June 10, 1965, and ordered the visitation rights of Joan and Lee to be ''at the discretion of the guardian.'' It is from this order that appeal is taken.

Perhaps under the misconception that the order of March 16, 1965, appointing Mabel guardian can be reviewed on this appeal, appellant has devoted the greater part of her brief to the invalidity and impropriety of the March 16, 1965, order and the insufficiency of the evidence to support the findings upon which it was made. Citing numerous cases, most of which involve a direct appeal from an order appointing guardian, she challenges the order of March 16, 1965, on a

variety of grounds—a natural parent has an inherent right to the custody of the child against a stranger; the evidence fails to sustain the trial court's finding that "her conduct in effect has constituted abandonment" of Julie for approximately eight years prior thereto; the preference of a child under the age of 14 is not controlling and, subject to the natural right of the parents, the paramount consideration is the best interests of the child. ■ No appeal having been taken from the order of March 16, 1965, appointing Mabel guardian, Joan has allowed the same to become final; it is now a binding adjudication that at that time the guardianship was necessary and proper. She cannot now attack the order on this appeal from a subsequent order denying her petition to terminate guardianship. If there is any merit to the within appeal, it must be found in an abuse of the trial court's discretion in its denial of Joan's petition to terminate Mabel's guardianship. In this connection, a set of rules completely different from those applicable to an appeal from the original appointment of guardian, controls.

■ Thus, Mabel, the duly appointed guardian of the person of the minor, has the care, custody and control of Julie "according to the order of appointment, until legally discharged." (§ 1500, Prob. Code.) In the order the trial judge inserted several conditions—reasonable visitation rights to the natural parents, and Julie shall be raised in the Jewish faith. (§ 1512, Prob. Code.) ■ As Julie's guardian, Mabel continues under the control and continuing jurisdiction of the court (§ 1400, Prob. Code) which is "broad, comprehensive and plenary." (*Guardianship of Reynolds,* 60 Cal.App.2d 669, 679 [141 P.2d 498].) However, when a guardian is once appointed he cannot be removed and the guardianship terminated except for cause provided by statute. (§ 1580, Prob. Code.) Among other causes for removal of a guardian provided for in section 1580, is " (8) When it is no longer necessary that the ward should be under guardianship." This appears to be the sole ground upon which Joan sought to terminate the guardianship.

■ "The law is established in California that once a guardian has been appointed such guardian can be removed only after a finding by the trial court that one of the causes listed in section 1580 of the Probate Code exists. (*Guardianship of Sturges,* 30 Cal.App.2d 477, 489 [86 P.2d 905].)" (*Guardianship of Sherman,* 42 Cal.App.2d 251, 253 [108 P.2d 717].) Here the trial judge made no finding relative to the

existence of any cause for termination of the guardianship, and the clear effect of his denial of Joan's petition is to negative the existence of any of the causes for removal of the guardian specified in section 1580, Probate Code, particularly that set up in subdivision (8) thereof. "[T]o deprive a guardian of his trust a showing of sufficient cause must be made. (*Lord* v. *Hough, supra* [37 Cal. 657].)" (*Guardianship of Reynolds*, 60 Cal.App.2d 669, 680 [141 P.2d 498]); and "A guardian may not be removed for a cause other than those stated in section 1580, Probate Code. (*Estate of Walsh*, 114 Cal.App.2d 82, 84 [249 P.2d 578].) The burden rests upon the moving party to establish that the guardianship is no longer necessary. (*Guardianship of Brock*, 154 Cal.App.2d 431, 433 [316 P.2d 3].)" (*Guardianship of Guidry*, 196 Cal.App.2d 426, 431 [16 Cal.Rptr. 579].) ■ Whether sufficient cause to remove a guardian exists is a question of fact to be determined in the broad discretion of the trial judge, whose determination will not be disturbed except upon a showing of manifest abuse of discretion. (*Guardianship of Reynolds*, 60 Cal.App.2d 669, 680 [141 P.2d 498]; *Guardianship of Brock*, 154 Cal App.2d 431, 433 [316 P.2d 3]; *Guardianship of Guidry*, 196 Cal.App.2d 426, 433 [16 Cal.Rptr. 579]; *Guardianship of Hall*, 200 Cal.App.2d 508, 510 [19 Cal.Rptr. 426].)

■ The order appointing Mabel guardian of Julie established as of March 16, 1965, that the guardianship was necessary and proper (*Guardianship of Sturges*, 30 Cal.App.2d 477, 489 [86 P.2d 905]), and implicit in that order is the trial court's finding that Mabel is a fit person to have the care and custody of the minor. Thus, the order of March 16, 1965, now final, placed Mabel in much the same preferred position as a parent; one year later, on March 28, 1966, Mabel was no longer the "stranger" referred to in the cases relied upon by appellant. In this connection, the court in *Guardianship of Sturges*, 30 Cal.App.2d 477, said at pages 489-490 [86 P.2d 905] : "It appears that by the order of the Superior Court of the State of California, in and for the County of Riverside, on August 9, 1933, the guardian herein was found to be a competent person to act as the guardian of said minor. Those findings and judgment have become final. A general guardian, so appointed, occupies a distinctive legal relationship against the whole world, and that relationship is permanent except when, by act of the guardian, it is forfeited for cause. . . . In *Guardianship of Howard*, 218 Cal. 607 [24 P.2d 486], the Supreme

Court, speaking through Mr. Chief Justice Waste, said: 'A guardian of the person of a minor stands in the place of a parent, whose duty it is to supply that watchfulness, care and discipline which are essential to the young. (*Guardianship of Taylor*, 3 Cof. Prob. Dec. 105; 13 Cal.Jur. 140, sec. 3.)' Hence, it appears that one who has been appointed general guardian occupies a legal status that can be attacked only for the same reasons and the same causes as though the general guardian was in fact a member of one of the preferred classes. The law having placed the guardian *in loco parentis* will not set aside the status for any other or different cause than it would in the case of a natural parent acting as guardian. The legal status is the same." In *Guardianship of Denny*, 97 Cal App.2d 763 [218 P.2d 792], the concurring opinion distinguished between the legal relationship of guardian and ward and that of parent and child. As to the latter, "The other parent can always secure an order changing custody upon a showing of changed circumstances (*Foster* v. *Foster*, 8 Cal.2d 719 [68 P.2d 719]), while a guardian, once appointed, can only be removed for the reasons specified in section 1580 of the Probate Code and changed circumstances is not one of the grounds there enumerated." (P. 765.)

Thus, Joan, the natural mother seeking to displace the guardian, no longer had the paramount parental right to the minor but had the burden of showing that it is no longer necessary that Julie be under guardianship. In *Guardianship of Furr*, 167 Cal.App.2d 604 [334 P.2d 936], appeal was taken from order denying a natural father's petition to remove the maternal grandmother as guardian of a minor. "The father has a superior right to custody of his child over the grandmother if he is a fit and proper person to have such custody. *Guardianship of Smith*, 42 Cal.2d 91, 93 [265 P.2d 888, 37 A.L.R 2d 867].) However where a guardian has been appointed and the parent of the child seeks the removal of such guardian he must satisfy the court that 'it is no longer necessary that the ward should be under guardianship.' (Prob. Code, § 1580, subd. (8).) This puts in issue the parent's fitness to have custody of his child and the burden is on him to establish his fitness in order to prove that the guardianship is no longer necessary. (*Guardianship of Brock*, 154 Cal.App.2d 431, 433-434 [316 P.2d 3].)

". . . . . . . . . . . .

". . . He must show that since that date he has so rehabilitated himself that he is now a fit and proper person to have

the custody of his child. (*Guardianship of Brock, supra,* 154 Cal.App.2d, pp. 433-434 ) '' (Pp. 605-606.)

In this connection Joan's witnesses attested to the condition of her home and her fitness to have Julie's custody. But also before the court was Joan's admission that she ''has been a weak person and has been guilty of what at times constituted erratic behavior''; the admission of Lee and Lee's father that in the previous custody hearing they opposed Joan's request for custody because they thought her not fit, and now ''lament'' their prior testimony; Joan's conduct since April 25, 1957, whereby she delegated more and more of her parenthood to others emasculating a direct relationship of parent and child, all in contradiction to her present interest in Julie; the fact—running as a thread through the investigator's report—that the natural parents are now incapable of relating constructively to the child; Julie's constant reference to Mabel as ''mother'' and her feeling of security and comfort only with Mabel; the fact that Mabel is the only mother Julie has ever known and has raised her as her own daughter for eight of her eleven years; the complications which would necessarily arise out of Julie's adjustment to a new stepfather and living with Joan's younger children; the lack in Julie's association with Joan and Lee of ''continued evidence of the parents' love for the child in visits, in letters, and other expressions of warmth and affection''; and Julie's decided preference to remain with Mabel. It is apparent that while Joan may have established that she is a fit mother to her three other children, she did not satisfy the trial judge of her fitness to have custody of Julie in order to prove that the guardianship is no longer necessary. We do not have before us a reporter's transcript of the oral proceedings had on the petition for guardianship (March 1965) but the reporter's transcript of the testimony taken on Joan's petition to terminate the guardianship reflects the opinion of the trial judge that Joan made little more showing than she made before, the hearing was but a ''retrial'' of the guardianship and custody matter of March 1965, and she presented nothing to cause a reversal of his prior ruling. In *Guardianship of Marshall,* 124 Cal.App.2d 807 [269 P.2d 160, 936], appeal was taken from order denying the natural mother's petition to terminate guardianship of a minor under 14; as here the guardian was the stepmother. The court held that there was no ground for removal and that it was in the best interest of the child that the stepmother remain as her

guardian. Similar in its facts to those at bench, the court said in *Marshall,* ''The record is replete with testimony of relatives, friends, and neighbors that Lorraine is a fit and proper person to have the custody of Diane. The evidence is uncontradicted that she keeps a very neat and clean home and that she looks after Diane's material and spiritual welfare. Diane regards Lorraine as her mother and the latter's parents as her grandparents. Diane addresses and refers to Lorraine as 'mother,' 'mom,' or 'mommie.' There appears to be a deep and genuine affection between Diane and Lorraine, such as would be found between a mother and her natural daughter. Diane stated she was happy with Lorraine and expressed a strong preference to remain with her. Lorraine is the only mother she has ever known.' (P. 812.) The questions in this proceeding were purely factual, and '' [t]he trial court having decided the facts adverse to [Joan], the matter is at an end.'' (*Guardianship of Marshall,* 124 Cal.App.2d 807, 812 [269 P.2d 160, 936].) We find no abuse of the trial court's discretion.

The order is affirmed.

Wood, P. J., and Fourt, J., concurred.