75 Cal.Rptr.2d 668 (1998)
64 Cal.App.4th 1228
GUARDIANSHIP OF KASSANDRA H. et al., Minors.
DON H., Petitioner and Respondent,
v.
PATRICIA F., Objector and Appellant.
No. G019208.
Court of Appeal, Fourth District, Division Three.
June 16, 1998.
*669 Michael J. Naughton, Laguna Hills, for Objector and Appellant.
Cesena & Lee, James H. Cesena, Orange, and Donna Bader, Laguna Beach, for Petitioner and Respondent.

OPINION
SILLS, Presiding Justice.
This case requires us to explore a troublesome area in California's guardianship law. Under the applicable statute, after a guardianship is established, a court may make an order ending the guardianship (which usually means sending the child back to live with a natural parent) if either one of two conditions exist:
(1) "it is no longer necessary that the ward have a guardian" or
(2) "it is in the ward's best interest to terminate the guardianship."
(Prob.Code, § 1601.)[1]
The troublesome part of the law lies in the disjunctive "or." By using that little word, the Legislature signaled that a guardianship might be terminated even if it wasn't in the best interest of the child to do so, as long as it was "no longer necessary" for the child to have a guardian.
In the case before us, a guardianship was initially established with the maternal grandmother because the parents were having marital difficulties, brought on in large part by the father's drinking. Having attended counseling and Alcoholics Anonymous and been sober for over three years, the father sought return of his children by terminating the guardianship.
The father's having overcome his drinking problem forced the trial court to wrestle with the implications of the use of the disjunctive in the statute, because it was still clear that it was not in the best interest of the children to return them to their father even though he was now soberbut by the same token the *670 trial judge could not say it was detrimental to return the children to him. Because the judge thought that the absence of detriment was dispositive, he concludedand not, judging by the record, without some real legal soul searchingthat the guardianship had to be terminated.
But the judge was not so comfortable with his decision that he implemented it immediately. Sometimes, as was said in one of literature's more famous speeches, the native hue of resolution is sicklied over with the pale cast of thought.[2] The judge's pale cast of thought tempered his resolution to give the children immediately back to their fathera result with which he clearly did not feel comfortableso he also stayed the termination of the guardianship pending this appeal.
The law governing the termination of guardianships is more complex than just whether the immediate cause for the guardianship has been removed and there is no detriment otherwise attending upon the children's return. As we explain below, in construing the statutory phrase "no longer necessary," it has long been the established law of California that the trial court must still evaluate whether the overall moral fitness of the natural parent seeking to end the guardianship sufficiently overcomes the inherent trauma of removing a child from a successful caregiver. Detriment, by contrast, is a standard used in juvenile dependency law, not guardianship law.
The trial court clearly used the wrong standard in evaluating the petition to terminate the guardianship. Moreover, as we explain, given the findings of the trial court, it is clear that the father could not have prevailed even if the court had used the right standard. Accordingly, we reverse the judgment and direct the court to enter a new order denying the petition for termination.

FACTS
Ongoing marital difficulties between respondent father, Don, and his wife, Julie, culminated in a domestic altercation in 1992 bringing out the police. Don had an alcohol problem, and the marital difficulties were a partial result of that problem. The difficulties also stemmed from severe mental problems suffered by Julie, which rendered her incapable of caring for herself, much less the couple's two children, Kassandra, then age 2, and Paige, then six months. Their eldest son, Jeffrey, had already come under the guardianship of his maternal grandmother Patricia, and the altercation resulted in Kassandra and Paige being sent to live with Patricia as well.
Patricia was formally appointed the guardian of Kassandra and Paige by court order in December 1992. It is undisputed that she has done an outstanding job with the children and the trial court would later so find, noting that the children have "an emotional, psychological bonding and nurturing relationship" with her. As an example of her "exemplary" (to use a word from the trial judge's later decision) care, Patricia has become highly involved in a local Headstart preschool program in part to further Kassandra's own education. Each girl has her own bedroom in Patricia's Irvine home.
After the guardianship was established, Don, for his part, began to overcome his alcohol problem. He attended counseling sessions and Alcoholics Anonymous. He has been sober for over three years. On May 27, 1993, Don filed a petition pursuant to Probate Code section 1601 to terminate the guardianship on the ground that it was no longer necessary.
After hearing the evidence, the trial judge concluded, not surprisingly, that the children's best interest was served by continuing the guardianship with Patricia. But the judge also found that it would not be "detrimental" to discontinue the guardianship and return the children to Don, and the court was clearly troubled by the opposing standards. Ultimately, and with a great degree of ambivalence, the judge concluded that the father merely had the burden of showing "that it would no longer ... be detrimental to the children to terminate [the] guardianship," and that, indeed, he had successfully carried that burden by showing he was "capable of *671 caring and managing the children in a reasonable way." Despite also finding, just a few breaths later, "that it would be, in this court's opinion, not in the best interest of the children to terminate the guardianship," he made an order doing so. Don, whom the court had found did not have a "parental" relationship up to that point with his children, said, "I know it will be hard, but I am really up for the challenge."
Patricia's attorney indicated her desire to appeal, and, as previously mentioned, the trial judge stayed the ruling pending the appeal: "By granting the stay, the status quo of the children being with the grandparent remains the same, and they suffer no immediate harm." And so the case came to us.

DISCUSSION

The Trial Court Used the Wrong Standard
The trial judge's evident ambivalence over the law evidences the concern of a thoughtful, conscientious jurist. His was not a decision reached without some disquiet about what he evidently thought was a poorly drafted statute requiring that children be torn from a loving guardian and placed with a natural parent just because the natural parent had overcome a problem which had led to the guardianship in the first place. However, we must respectfully disagree with the trial judge's reading of the applicable statute. It is not as bad for children as he thought.
The statute, Probate Code section 1601 (quoted in full in footnote 1), says a court may terminate a guardianship if it is "no longer necessary" that a child have a guardian or it is in the child's best interest. The trial judge misconstrued the words "no longer necessary" to mean something on the order of, "would not be detrimental to return the child to his or her natural parent." But that is not the way the statute has been interpreted for generations by California courts, who have required an overall evaluation of a natural parent's moral fitness in the context of whether changed circumstances (usually, the natural parent's efforts toward rehabilitation) justified a change in custody arrangements.[3] Case law governing the termination of guardianships typically revolves around a drama of parental trouble and reformation, requiring the court to evaluate the overall moral fitness of the natural parent in a context of whether any changed circumstances justify a change in custody. Manifestly the legal criteria are not as simple as just whether the singular circumstance leading to the guardianship has been eliminatedas if the child had been a chattel who needed to be temporarily stored someplace.
In Guardianship of Boulad (1949) 90 Cal. App.2d 135, 202 P.2d 562, a married woman had a child by a man not her husband, precipitating the guardianship. Later she remarried and sought termination of the guardianship, which the trial court granted. The appellate court reversed.
In reversing the termination, the court noted that "[t]he only change in conditions since the appointment of the guardians is the fact that [she] ha[d] remarried." (Id. at p. 138, 202 P.2d 562.) That wasn't enough because, as the court noted, "the same principles and rules are applicable to a guardianship matter" as in normal family law, (Ibid.) "To justify a modification of an order for custody of a minor child,'" wrote the Boulad court, "there must be a change of circumstances arising after the original decree was entered." (Ibid.) And the mere fact of remarriage was not enough "to warrant the change in the custody of the child." (Ibid.) Yet it was the marital status of the mother which had led to the guardianship originally.
Guardianship of Brock (1957) 154 Cal. App.2d 431, 316 P.2d 3 similarly emphasized the need for a substantial showing of reformation in the context of circumstances justifying *672 a change of custody in a case involving a more striking set of facts. There, a guardianship was established for a child of a woman who was described by the court in terms which evoke the image of a gun moll in a grade B 1940's movie: She was a "`kept' woman" who made "no bones" about the fact that she was an associate of gamblers and who did not believe in working for a living; she stayed up all night and slept all day; she had low moral standards. (Id., at p. 435, 316 P.2d 3.) Then she and the father "remarried" and began living "`a respectable life,'" and, seven months after the appointment of a guardianship, the two petitioned for its termination. (Id. at p. 432, 316 P.2d 3.)
As in the present case, there really was no dispute as to whether the child's best interest would be promoted by the termination of the guardianship. Rather, the case boiled down to whether it was "`no longer necessary'" to keep the guardianship in place. (Id. at p. 433, 316 P.2d 3.) The trial court said that it was no longer necessary, but the appellate court disagreed.
The Brock court emphasized the classic change of circumstances rule found in normal family law. (Id., at p. 433, 316 P.2d 3 ["Bearing in mind the rule that the same principles are applicable to this proceeding as to one for modification of a custody order in a divorce case"].) Thus it styled the issue as whether the mother had "graduated into fitness" by the time of the hearing. (Id., at p. 434, 316 P.2d 3.) Because the original reason for the guardianship was the mother's dissolution, the appellate court held there was a need for a "definite showing of a reformed way of life." (Id. at p. 435, 316 P.2d 3, emphasis added.)
In Brock, the guardianship existed for one year. The court held the period was simply too short to demonstrate "a finding of changed or other circumstances which would warrant a termination of the guardianship." (Id. at pp. 436-437, 316 P.2d 3.) Accordingly, the order revoking the guardianship was reversed.
A decade later, Justice Lillie reiterated the same ideas in Guardianship of Davis (1967) 253 Cal.App.2d 754, 61 Cal.Rptr. 297. In Davis, a newly separated young mother given to "erratic behavior" surrendered her 10-month-old to a child care service. When she was three years old, the child went to live with her natural father and his new wife. Three years later the father and his wife separated; the child remained with his now ex-wife. Another two years passed, and the natural mother, who now had three other children of her own, filed for a change of custody. The ex-wife (and caretaker) of the child responded with a request for the establishment of a formal guardianship. The court made an order appointing the ex-wife as the child's guardian; the natural mother got visitation rights. (See id. at pp. 756-757, 61 Cal.Rptr. 297.) That order became final. A dispute over visitation rights then arose, and the natural mother filed a petition to terminate the guardianship.
The petition was denied (by now, trial courts had the benefit of Boulad and Brock) and this time the appellate court affirmed, in a case which forced it to construe the meaning of the words "no longer necessary" as they applied to the continuation of a guardianship. (See Davis, supra, 253 Cal.App.2d at p. 760, 61 Cal.Rptr. 297.)[4]
The Davis court's construction of the phrase was animated by two legal concepts. One, a moving party has the burden of establishing that the guardianship is no longer necessary. (Id. at p. 761, 61 Cal.Rptr. 297.) Two, a guardian occupies an important and high legal status vis-à-vis the child: "[O]ne who has been appointed general guardian occupies a legal status that can be attacked only for the same reasons and the same causes as though the general guardian was in fact a member of one of the preferred classes." (Id. at p. 762, 61 Cal.Rptr. 297.)
In light of those concepts, the Davis court reasoned that the words "no longer necessary" put "in issue the parent's fitness to have custody of his child." (Ibid.) The court then examined the totality of evidence *673 bearing on the natural mother's fitness, including information bearing on her conduct for the previous ten years, the strength of the current bond between the child and the guardian, and the "complications" which would necessarily arise if the guardianship were terminated. After looking at all this evidence, it was apparent that the natural mother was not fit to have custody of the child in question even though she may have been a "fit" mother to her other three children. (Id. at p. 763, 61 Cal.Rptr. 297.) The order denying the application to terminate the guardianship was therefore affirmed.
Cases where guardianships have been held properly terminated also required an examination of the totality of evidence bearing on the natural parent's fitness. In Guardianship of Case (1943) 57 Cal.App.2d 844, 135 P.2d 681, a guardianship was established where the natural mother died soon after a child's birth while his father was in the Navy. Later, the father retired from the Navy and sought to terminate the guardianship. He demonstrated to the trial court's satisfaction that he was a "fit and proper person to have the care, custody and control of his son" and obtained an order terminating the guardianship. (Id. at p. 846, 135 P.2d 681) Since his return to civilian life, the father had "gained the respect of his neighbors," had earned enough money "sufficient to maintain a comfortable home," and had remarried. (Id. at p. 848, 135 P.2d 681.) And, while in the year of the child's birth the father was serving time in a naval prison (the court did not say for what),[5] that was seven years previous to the hearing and it was clear that by the time of the hearing he was a fit and proper person.
In the relatively more recent case of Guardianship of M.S.W. (1982) 136 Cal. App.3d 708, 186 Cal.Rptr. 430, the guardianship was originally established because an unmarried couple simply were "financially unable" to care for their child. Several years later, they had married, both of them were employed, and they sought to end the guardianship. The trial court heard a great deal of negative evidence about the couple from the guardians (the paternal grandparents) which, the appellate court would later acknowledge, would have justified the trial court in refusing to terminate the guardianship. (Id. at p. 711, 186 Cal.Rptr. 430.) But the negative evidence was contradicted by other evidence. Thus the appellate court, analyzing the case under the venerable substantial evidence test, affirmed the trial court's decision to terminate the guardianship. (Id. at pp. 711-712, 186 Cal.Rptr. 430.)
From the foregoing, it is clear that the trial judge here used the wrong standard in evaluating Don's petition to end the guardianship. He applied a detriment standard like the one found in juvenile dependency law. In dependency law, the child must be returned to his or her natural parents at various stages in the process unless the court finds it would be detrimental to do so. (See Welf. & Inst.Code, §§ 366.2, subd. (e); 366.21, subd. (f); 366.22, subd. (a) [requiring return of child to parent at six, twelve and eighteen month reviews respectively unless court finds by preponderance of evidence that return would create a substantial risk of detriment to the physical or emotional well-being of the child].) Like a word processing program which is set up to automatically "default" to a certain format, the trial judge reasoned that a child should be automatically returned to the natural parent unless detriment is found.
Juvenile dependency law, however, is not a paradigm which can be imported into guardianship termination law. For one thing, and at the most basic, common sense level, there is a difference between a parent voluntarily giving a child up to a guardian and the government coercively taking the child away over the parent's strenuous objections. Obviously, in the latter case, the law must take into account a parent's fundamental right to *674 act as parent to his or her children in light of the state's interest that the children not be abused or neglected. Given the parent's fundamental right and the government coercion necessarily inherent in the dependency process, a showing of detriment to prevent an automatic return is a logical way of balancing the values involved. (Cf. Guardianship of Stephen G. (1995) 40 Cal.App.4th 1418, 1426-1429, 47 Cal.Rptr.2d 409 [treating involuntary creation of guardianship as implicating fundamental liberty interest in right to parent].) Voluntary relinquishments of children and subsequent guardianship terminations, are, by contrast, as Boulad, Brock and Davis all indicated, more like classic family law custody changes in the wake of a dissolution of marriage.
Moreover, the elementary dynamics of the two bodies of law are different, as illustrated by the very recent case of Guardianship of Kaylee J. (1997) 55 Cal.App.4th 1425, 64 Cal.Rptr.2d 662. In Kaylee J., a mother voluntarily placed her daughter with the paternal grandmother and stepgrandfather. About two years later the stepgrandfather filed a guardianship petition, which the mother contested. The trial court appointed the stepgrandfather as guardian, but also directed the parties to jointly develop a reunification plan. When they couldn't, the court referred the matter to family court services for development of a visitation plan "with a view toward eventual reunification." (Id. at p. 1429, 64 Cal.Rptr.2d 662.) The stepgrandfather then appealed from the ensuing order, contending that the trial court had no authority to incorporate a reunification plan as part of a guardianship order. (See id. at p. 1430, 64 Cal.Rptr.2d 662.)
The Court of Appeal agreed with him, contrasting the highly structured framework of the juvenile dependency law with probate guardianship proceedings; the latter looks to best interest of the child and does not allow for reunification services to be ordered. (See id. at p. 1432, 64 Cal.Rptr.2d 662.) "In probate guardianship proceedings, like custody proceedings under the Family Code, the courts must determine which custody placement is in the best interest of the child but may not order reunification services"(Ibid., emphasis added; see also Family Code, § section 3026 ["Family reunification services shall not be ordered as part of a child custody or visitation rights proceeding."].)
Clearly, then, the trial judge erred in using the detriment test imported from juvenile dependency law.

The Right Standard
It is one thing to say that the trial judge used a wrong standard in explicating the "no longer necessary" clause of Probate Code section 1601. It is a somewhat more difficult task to frame the right one. While the cases up to now have provided guidance, they have not articulated the applicable test. We shall now try.
Clearly, "no longer necessary" as used in Probate Code section 1601 cannot be merely a synonym for "best interest." To so read the statute would contravene the basic principle of linguistic interpretation against surplusage. (E.g., People v. Loeun (1997) 17 Cal.4th 1, 9, 69 Cal.Rptr.2d 776, 947 P.2d 1313 ["`Interpretations that ... render words surplusage are to be avoided.'"].) On that much, certainly, the trial judge was correct.
On the other hand, it is also clear from Boulad, Brock and Davis that the overall moral fitness of the natural parents seeking a termination of a guardianship must be evaluated, not just the isolated aspect of their lives which led to the guardianship. A child experiences the whole of a human being as parent, not just some disembodied part. It is good, for example, that Don has overcome his drinking problem, but that fact alone can hardly be dispositive, unless the law were to consider children on the same plane as chattels. There are plenty of bad parents who never touch alcohol.
Additionally, continuity and stability in a child's life most certainly count for something, again as the Boulad, Brock and Davis cases all illustrate by their use of the family law changed circumstances standard. Children are not dogwood trees, to be uprooted, replanted, then replanted again for expediency's sake. (See Adoption of Michelle T. (1975) 44 Cal.App.3d 699, 707, 117 Cal. *675 Rptr. 856, quoting Williams v. Neumann (Ky.App.1966) 405 S.W.2d 556, 557 ["`cannot be suddenly transplanted like a dogwood tree without running serious and dangerous risk of frustration and bewilderment'"].) The law of guardianship necessarily entails higher standards than those applicable to a pawn shop. The idea that children may be temporarily deposited in the hands of some bailee to be recovered at willlike an old lamp that one doesn't know what to do with, so one puts it in storageis contradicted by the cases and common experience.
In substantive family law, stability and continuity in a child's living arrangement are so important in themselves that there must be a "persuasive showing of changed circumstances affecting the child" to overcome the disruption necessarily inherent in any change of custody. (See In re Marriage of Carney (1979) 24 Cal.3d 725, 730, 157 Cal.Rptr. 383, 598 P.2d 36 ["It is settled that to justify ordering a change in custody there must generally be a persuasive showing of changed circumstances affecting the child."]; see also In re Marriage of Burgess (1996) 13 Cal.4th 25, 39, 51 Cal.Rptr.2d 444, 913 P.2d 473 [referring to "the presumption in favor of stability and continuity in the child's primary custodial relationship"]; Burchard v. Garay (1986) 42 Cal.3d 531, 535, 229 Cal.Rptr. 800, 724 P.2d 486 [the court "should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest"]; In re Marriage of Whealon (1997) 53 Cal.App.4th 132, 141-142, 61 Cal.Rptr.2d 559 ["Given the importance of stability and continuity in children's lives, a burden rests on the party seeking to change custody."].)
We do not go so far as to say that the "changed circumstances" of a guardianship case must demonstrate "best interest" to justify termination of a guardianship, lest the surplusage rule be contravened. (Cf. Burchard, supra, 42 Cal.3d at p. 535, 229 Cal.Rptr. 800, 724 P.2d 486.) However, any new circumstances justifying the termination of a guardianship must be sufficient to overcome the inherent disruption of tearing a child away from a guardian who is doing a good job of caring for and nurturing the child. Anything less would mean that a court would have the authority to terminate a guardianship even when such termination would be detrimentalin every sense of the wordto the child.[6]
The bottom line is this: The "no longer necessary" language of section 1601 necessarily requires a showing of overall fitness on the part of the natural parent seeking to end the guardianship sufficient to overcome the inherent trauma of removing a successful caregiver.
Finally, the question arises as to whether requiring such a showing would have the unintended consequence of discouraging voluntary guardianships. Voluntary guardianship allows parents to relinquish their children, possibly to a person of their choice, in a "nonjudgmental process." (See Goldstein et al, The Best Interests of the Child (1996) p. 102.) The requirement of an overall examination of fitness sufficient to overcome the trauma of separation from a caregiver necessarily entails some implication that a parent might not be able to meet the test and therefore would have at least some incentive to avoid voluntary guardianship. The answer to this concern, however, is that its only alternativethe pawnshop or bailment model of guardianshipis wholly unacceptable. To read the "no longer necessary" language of section 1601 so as to avoid any disincentive to establish a guardianship in the first place would mean that the parent's interest in a right of retrieval would outweigh the child's interest in a stable and secure environment, andunless the Legislature is going to plainly *676 say otherwisethere is no way that any court is going to put its imprimatur on that.

Application of the Right Standard
The final question of all is where to go from here. It is one thing to win, as Don did here, under the wrong standard. It is another to have even the possibility of winning if the right one had been used. Must the case be remanded for further proceedings using the right standard or is the record sufficient to direct the trial court?
The answer is the latter. On this record, we can say with some confidence that Don did not carry the burden of showing overall fitness sufficient to overcome the trauma inherent in removing the guardian. What is dispositive is a set of specific findings by the trial court:
 Don had little or no "psychological relationship with the children" and essentially "function[ed] in the position of a stranger" to them.
 He was going to raise the children in a one-bedroom apartment.
 He had made "little or no plans by way of any logistical arrangements for day-care" for them, or for their school, medical needs, or dental care.
 At the same time, there was an abiding psychological bond between the girls and their guardian, Patricia, and Patricia's care of them was "exemplary."
Under such facts, we cannot say that Don presented a picture of overall fitness sufficient to overcome the inherent trauma of a change of custody. It is true that he had cured the one big problem (his drinking) which had led to the guardianship. But he had not bothered with any of the logistical details of parenthood. More importantly, he had not developed a strong bond with his children that would overcome the upheaval of terminating the formal care of Patricia and entrusting it to him. Indeed, he was a virtual stranger to the children. To change custody given such facts is to conduct, to borrow a phrase from our Supreme Court decision in Matter of Lee (1913) 165 Cal. 279, 281, 131 P. 749, a "doubtful experiment" with the children as the subjects.

CONCLUSION
The termination order is reversed, with directions to the court to enter a new order denying the petition. In the interests of justice each side will bear its own costs on appeal.
WALLIN and SCOVILLE[*], JJ., concur.
NOTES
[1] Probate Code § 1601 provides in its entirety: "Upon petition of the guardian, a parent, or the ward, the court may make an order terminating the guardianship if the court determines that it is no longer necessary that the ward have a guardian or that it is in the ward's best interest to terminate the guardianship. Notice of the hearing on the petition shall be given for the period and in the manner provided in Chapter 3 (commencing with Section 1460) of Part 1."
[2] It's from the "to be" soliloquy in Hamlet.
[3] That little word "may" of course is significant as well. "May" is (in most contexts) permissive, as distinct from the mandatory "shall." Yet the trial judge appeared to read the statute to require a mandatory, not permissive, return of the children if the "no longer necessary" clause applied. As we explain, the "no longer necessary" clause did not apply. The question arises then as to whether the trial judge would still have the discretion to refuse to terminate the guardianship even if the clause did apply. Because Don could not have won even if the trial court had applied the right standard, we may leave that question unanswered.
[4] At the time, the "no longer necessary" ground for termination of a guardianship was codified in Probate Code section 1580, subdivision (d).
[5] In the same breath the court noted that the crime was "mala prohibita," but also was "an act involving moral turpitude," yet still was not conclusive proof of a "vicious character." (Case, supra, 57 Cal.App.2d at p. 849, 135 P.2d 681.) From this description one gets the idea that the crime was some sort of sexual morals charge under naval regulationswhat crime could possibly be mere mala prohibita yet also involve "moral turpitude"jaywalking? Thus in all probability the father was not guilty of any violent or theft offense.
[6] When courts attempt to formulate tests, there is always the problem that meaning in language can only be pushed to a certain point. In the case before us, for example, the trial judge found that it would not be "detrimental" for the children to be with their father, yet he clearly also found that they would, in comparison with their present guardian, be worse off. Being worse off than you were before is not "detriment"? Yet if detriment were defined to mean, say, "less than another viable alternative," then "lack of detriment" would only be another way of saying "best interest." The trial judge obviously did not mean to define detriment that way. In context, the trial judge used the word "detriment" as the term of art it has become in the juvenile law.
[*] Retired Presiding Justice of the Court of Appeal, assigned by the Chief Justice pursuant to California Constitution, article VI, section 6.