Filed 8/31/22  In re Taylor M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re Taylor M., a Minor. | |
| ROBERT M. et al., | F082731 |
| Petitioners and Appellants, | (Tulare Super. Ct. No. VAD008613) |
| v. | |
| J.M. et al., | **OPINION** |
| Objectors and Respondents. | |

APPEAL from an order of the Superior Court of Tulare County.  Nathan D. Ide, Judge.

Matthew L. Green for Petitioners and Appellants.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Objector and Respondent, Matthew P.

Lelah S. Fisher, under appointment by the Court of Appeal, for Objector and Respondent, J.M.

-ooOoo-

Appellants Robert M.[1] and Jo. M. (collectively appellants), the grandparents and legal guardians of the child Taylor M. (Taylor), appeal the trial court's denial of their petition to terminate parental rights under Probate Code 1516.5 and Family Code section 7822. Appellants contend the trial court erred by failing to grant their petition to terminate parental rights. We conclude the record compelled a finding that adoption was in Taylor's best interest, and we reverse with directions to the trial court to grant the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Respondents, J.M. (Mother) and Matthew P. (Father), are parents to Taylor who was born in July of 2015. Mother and Taylor lived with appellants at the time of his birth, and they continued to live with them until Mother moved to Idaho with Taylor in December of 2016. Appellants allowed Mother and Taylor to live in their home during this period without paying rent in order for Mother to "straighten her life out." In May of 2017, Jo. M. flew to Idaho to pick up Taylor after Mother requested that appellants take care of the child while Mother was having a difficult time and lacked stability.

Appellants continued to provide care for the child in their home, and they were appointed legal guardians of Taylor on June 11, 2018. On June 28, 2019, appellants filed a petition to declare the child free from parental custody and control and terminate parental rights pursuant to Probate Code section 1516.5 and Family Code section 7822.

On June 17, 2020, the Tulare County Health and Human Services Agency (agency) filed an investigative report, which was completed by an agency social worker. Appellants informed the social worker that Mother, who was 32 years of age, had been using methamphetamine since she was approximately 15 or 16 years old. Mother and Father never lived together, and appellants took Taylor to Father's house for visits during

---

[1] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

2.

the first year and a half of the child's life. The appellants' claimed Father only contacted Taylor by phone twice since he had been in their care.

Mother made occasional phone calls to Taylor and returned to California for one month where she provided care for Taylor only part of the time. Appellants alleged Mother stole from them on occasion, and she was eventually convicted and served time in prison. Mother was released from prison in January of 2020, but appellants refused to allow contact between her and Taylor until she proved that she was stable.

Taylor was four years old at the time of the social worker's report, and he was described as active but shy during their "FaceTime" video call. He enjoyed being outside and helping on the appellants' five-acre property with various animals. Taylor had no ongoing health issues and received routine medical care. It was noted that Father had no in-person contact with the child in over three years, and Mother had no contact with the child in over two years.

The social worker concluded the parents had not provided financial support for the child during their absence, and the parents had not established or maintained a parent-child relationship with the child. The social worker recommended that the court free Taylor from the custody and control of Mother and Father. It further recommended the court find by clear and convincing evidence that the child had been in the physical custody of the appellants for more than two years, that Taylor would benefit from being adopted by appellants, and that it would be in the best interest of the child to be declared free from the custody and control of Mother and Father.

On October 23, 2020, appellants filed an amended petition to terminate parental rights, which placed the child in their sole legal and physical custody under a legal guardianship at two years and four months at the time of its filing. The amended petition continued to request that parental rights of the child be terminated pursuant to Probate Code section 1516.5 and Family Code section 7822.

A contested hearing took place on February 3, 2021. The trial court received the agency's written report of investigation into evidence, noted service of the amended petition, and began the hearing with testimony from appellant, Jo. M. Jo. M. testified that Taylor was her grandson, and he had been in her and her husband's life since his birth. Mother stayed with appellants for them to help her until she moved to Idaho with the child in December of 2016. Jo. M. stated she was asked by Mother to pick Taylor up from Idaho in May of 2017 due to struggles Mother was having with drugs.

Jo. M. believed the arrangement would be temporary and that Mother would be able to have Taylor back when Mother was clean and sober. Mother came out to stay with the child for a month during his second birthday where she split time caring for Taylor with appellants. It was not until January of 2018 that Mother returned to visit the child in person. Jo. M. testified that Mother would call, text, or FaceTime on occasion during this time, but she was not stable and believed to be using drugs.

Beginning in June of 2018, Mother was incarcerated for 17 months arising from a burglary conviction. Jo. M. stated that Mother did not attempt to contact Taylor until she began writing letters close to her release date, and she did not visit with the child after she was released from prison through the date of the hearing. Father was aware that the child was residing with appellants beginning in May 2017, however, he never visited or contacted the child. Mother and Father provided no financial support for the child while he was residing with appellants.

Jo. M. testified that they made the decision to adopt Taylor after he started to call appellants "mommy" and "daddy." On the day of the hearing, Taylor told Jo. M., "Mommy, I just love you and I just want to be with you and Daddy." She felt that Taylor was attached to her and her husband and there was never a bond between the child and his biological parents. Appellants provided for the child's medical, educational, and social needs while Jo. M. stayed home each day to provide care for Taylor.

4.

On cross examination, Jo. M. testified that there was never a specific time frame for when the child would return to Mother's care. She explained that she was unable to receive a call from Father during Easter because she blocked his number due to the unhealthy relationship between Mother and Father. Jo. M. also discussed how Taylor went back and forth between her home and Mother's home for one month in the summer of 2017. Jo. M. was aware of Father's court filings to establish paternity and visitation along with his objection to the establishment of the guardianship.

Appellants allowed Mother to stay with them for the first year and a half of the child's life because they hoped Mother would "straighten her life out." When Taylor was only a few months old, Mother had to spend three to six weeks in jail while appellants provided care for him. Mother and appellants agreed to establish the guardianship in late 2017 to allow Taylor to be covered by the health insurance of the appellants.

Jo. M. testified that Mother came back in January of 2018 and stole valuable items and $21,000 in cash from their home before she left. While incarcerated, Mother offered to send money from her earnings at fire camp, but Jo. M. urged her to save the money for when she was released. Mother went to rehab once released and Jo. M. told Mother that they could talk about returning Taylor to her care if she stayed clean for six months. It was acknowledged that Mother only asked to visit with Taylor during Easter of 2020 since being released from custody.

Appellants' counsel called Mother as their next witness. Mother testified that she wrote two letters to her son while she was incarcerated for 17 months. She claimed Jo. M. prevented her from speaking with Taylor and would only allow her to hear about Taylor. A court order was in place from Mother's criminal proceedings that prohibited her from speaking with appellants, and she believed the order prevented her from contacting Taylor as well.

Mother testified that her life "turned upside down" when her little sister committed suicide in March of 2017. She lost hours at work when she returned from the funeral,

and she could no longer afford to pay for daycare for Taylor. The loss of daycare led to Mother's request for appellants to take Taylor back to California in May of 2017. Mother began using drugs again after her short stay in California in the summer of 2017. She acknowledged her agreement to the guardianship in December of 2017.

Mother returned to California in January of 2018 and picked up her son from her sister's home while appellants were out of the country on vacation. She then went to appellants' home and stole money, which led to a conviction and prison sentence. Mother testified that Jo. M. would not allow her to speak with Taylor, but she would give her updates when she called once per week. She received the appellants' petition to terminate parental rights while she was in prison. During her prison sentence, Mother obtained her GED (General Education Development), and she went to a residential program for 90 days after her early release. Mother claimed Jo. M. stated that Mother could see Taylor if she was still doing well six months after completion of her program.

Mother testified that she completed the residential program, and she claimed to be sober since being released from prison. She was working in Porterville and continuing her relationship with Father, with whom she had another child in the last year. Requests for visitation were made by Mother through Facebook in the year leading up to the contested hearing, but appellants did not allow any visitation either in person or by phone. Mother concluded her testimony by acknowledging Father's assistance with caring for Taylor for "a few weeks" when she moved to Idaho in December of 2016.

As the final witness in the hearing, Father testified that Mother mediated any of his contact with Taylor. He stated that he saw Taylor three to four times per week during the first year and a half when Mother and Taylor lived with appellants. His contact with Taylor became less often once Mother moved to Idaho, however, he kept in contact with her. The current relationship between Mother and Father began once she was released from prison.

Father testified that he also saw Taylor "a few times" during the month that Mother returned to California in the summer of 2017. In his objection to the original petition for guardianship, Father asserted his request to have visitation with Taylor. He further testified that he did not wish to "rip [Taylor] away where he's most comfortable," and his primary wish was to have visitation and establish a relationship with Taylor.

At the close of evidence, counsel for appellants argued that the petition should be granted for any of three different bases: (1) the two-year custody and best interest requirement of Probate Code section 1516.5, (2) abandonment by the parents under Family Code section 7822, subd. (a), and (3) willful abandonment by the parents under Family Code section 8604. Counsel for Father argued that appellants failed to prove either abandonment or an intent to abandon by either parent. Mother's counsel also argued that abandonment had not been proven, and he stated that termination of parental rights would not be "fair" or "equitable" under the circumstances. After hearing counsel's arguments, the court indicated that its ruling would be put in writing.

On March 5, 2021, the court issued a written ruling denying appellants' petition to terminate parental rights. The trial court found that appellants did not have sole custody for a period of two years due to a one-month period that Mother shared custody and care of the child with appellants in July or August of 2017. The trial court also discussed a "rebuttal presumption" of unfitness as it began to discuss the best interest factors of Probate Code section 1516.5. It proceeded to discuss other factors than the stability of the child's placement such as "the relationship between the child and birth parent, the relationship between the child and guardians, and the child and any siblings." The court discussed these factors as follows:

> "In the present case, there has been no evidence the child and Mother had a poor relationship when she had full custody. There was also no evidence that the relationship was distant between May 2017 to July 2017 when Mother first left the minor with Petitioners. What is evident is that the relationship became distant after 17 months in jail. After that time, however, Mother did make efforts to see the minor, including filing a

7.

request for order in the guardianship matter. After that time, any diminution in the relationship with the minor has been contributed to by the Petitioner by not allowing any contact while Mother was in prison or afterward. Based upon the other factors discussed regarding the purpose of Probate Code Section 1516.5, the Court notes that neither the Guardianship nor de facto physical custody were two years old at the time the adoption proceeding was filed, and Mother has demonstrated through successful completion of post jail programs and rehabilitation programs that she is not unfit to properly care for the child."

Based on this discussion, the court found that appellants had also not proven that it would be in the best interests of the child to be adopted and declined to terminate parental rights under Probate Code section 1516.5. Similarly, the trial court found that appellants had failed to demonstrate that there was an intent to abandon the child by the parents, and it declined to terminate parental rights under Family Code sections 7822 and 8604. The guardianship matter was to continue as to the request for visitation by Mother that was filed in December of 2019 and stayed during the adoption proceeding.

## DISCUSSION

### I. Abandonment

Appellants contend the trial court erred by failing to terminate parental rights based upon the parents' abandonment of the child pursuant to Family Code section 7822, subdivision (a).

#### A. *Legal Principles*

Family Code Section 7800 et seq. governs proceedings to have a minor child declared free from a parent's custody and control. (Fam. Code, § 7802; *Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1009 (*Allison C.*).) "A declaration of freedom from parental custody and control … terminates all parental rights and responsibilities with regard to the child." (Fam. Code, § 7803.)

A court may declare a child free from parental custody and control if the parent has abandoned the child. (Fam. Code, § 7822; *Allison C.*, *supra*, 164 Cal.App.4th at p. 1010.) Abandonment may occur when "[o]ne parent has left the child in the care and

custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (Fam. Code, § 7822, subd. (a)(3).) "The … failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent … ha[s] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent .…" (*Id*. at subd. (b).) "The parent need not intend to abandon the child permanently; rather, it is sufficient that the parent had the intent to abandon the child during the statutory period." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 68.) It is not required that the statutory period be the period immediately preceding the filing of the petition. (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 922.)

### B.     *Standard of Review*

Where, as here, "the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals," "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528; *ibid.*)

### C.     *Analysis*

The trial court found that appellants failed to establish by clear and convincing evidence that Mother and Father intended to abandon Taylor. Although appellants point to various facts suggesting that Mother and Father may have intended to abandon the child, such as the fact that Mother left Taylor in appellants' care or that Father had not sought custody over the child, these facts are neither "(1) 'uncontradicted and unimpeached' [nor] (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) Mother contradicted the appellants evidence of intent to abandon by testifying that her requests to communicate with Taylor were refused by appellants.

The appellants' evidence here, while significant, was insufficient to compel a contrary finding. We therefore find the trial court's determinations on the issue of abandonment as an insufficient basis for reversal. We do not suggest that whenever a parent states that he or she did not intend to abandon a child, that statement alone is enough to defeat a finding of abandonment. It remains up to the trial court to determine the credibility and weight of such a statement in determining whether there is clear and convincing evidence that the parent left the child with the intent to abandon him or her. Here the trial court credited Mother's testimony enough to find that the grandparents failed to carry their burden.

## II.     Probate Code Section 1516.5

Appellants also contend the trial court erred when it refused to find that appellants had sole custody of the child for a period of two years pursuant to Probate Code section 1516.5. Appellants argue that the trial court failed to consider the child's best interest while inappropriately applying an unfitness standard in its analysis of Probate Code section 1516.5.

### A.     *Legal Principles*

A probate guardianship is a private custody arrangement, approved but not supervised by the court; it is distinct from a guardianship ordered as a result of juvenile dependency proceedings. (*Guardianship of Ann S*. (2009) 45 Cal.4th 1110, 1133 (*Ann S.*).) Probate guardianships provide an alternative placement for children who cannot safely remain with their parents. (*Id*. at p. 1122.) "It is the family members and the guardians who determine, with court approval, whether a guardianship is established, and thereafter whether parent and child will be reunited, or the guardianship continued, or an adoption sought under [Probate Code] section 1516.5." (*Ibid*.)

When the court appoints a guardian, the parent's authority ceases. (*Ann S*., *supra*, 45 Cal.4th at p. 1123.) While the court has discretion to grant visitation, parental rights otherwise are completely suspended for the duration of the probate guardianship and the

10.

guardian assumes the care, custody and control of the child. (*Id*. at pp. 1123–1124.) "Unless ended by court order, the guardianship continues until the child [either] 'attains majority or dies.' " (*Id*. at p. 1124.) "The court may terminate the guardianship on a petition by the guardian, a parent, or the child, based on the child's best interest." (*Ibid*.)

A proceeding under Probate Code section 1516.5 may be brought when all of the following requirements are satisfied: "(1) One or both parents do not have the legal custody of the child. [¶] (2) The child has been in the physical custody of the guardian for a period of not less than two years. [¶] (3) The court finds that the child would benefit from being adopted by his or her guardian.…" (Prob. Code, § 1516.5, subd. (a)(1)–(3).) The guardian bears the burden of making the requisite showings under Probate Code section 1516.5 by clear and convincing evidence. (See *Ann S*., *supra*, 45 Cal.4th at p. 1127.)

" 'Benefit' in this context means that adoption would be the best alternative for the child …" and requires a determination of the child's best interest. (*Ann S*., *supra*, 45 Cal.4th at p. 1128, fn. 10.) In making this determination, the court considers all factors relating to the child's best interest, including but not limited to the nature and extent of the child's relationship with his or her birth parents, his or her guardian and the guardian's family, and any siblings or half siblings. (Prob. Code, § 1516.5, subd. (a).) Other relevant factors "include the circumstances leading to guardianship, the parent's efforts to maintain contact with the child, any exigencies that might hamper those efforts, and other evidence of commitment to parental responsibilities." (*Ann S*., *supra*, at p. 1132.)

The California Supreme Court has clarified that due process does not always require a finding of current parental unfitness before the termination of parental rights in a proceeding under Probate Code section 1516.5. (*Ann S*., *supra*, 45 Cal.4th at p. 1128.) It emphasized that, "due process is satisfied if unfitness is established at an earlier stage, and parental rights [are] terminated later based on the child's best interest." (*Id*. at

11.

p. 1134.)  A section 1516.5 proceeding, however, does not separate the child from parental custody.  "The family," the high court explains, "is dismembered not at the time of a section 1516.5 hearing, but at least two years earlier when the guardianship is established." (*Ann S.*, at p. 1133.)

> **B.     *Standard of Review***

"[T]he decision to terminate parental rights lies in the first instance within the discretion of the trial court, 'and will not be disturbed on appeal absent an abuse of that discretion.' " (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1382.)  " ' "The abuse of discretion standard … measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria." ' [Citation.]  The scope of the trial court's discretion is limited by law governing the subject of the action taken.  [Citation.]  An action that transgresses the bounds of the applicable legal principles is deemed an abuse of discretion.  [Citation.]  In applying the abuse of discretion standard, we determine whether the trial court's factual findings are supported by substantial evidence and independently review its legal conclusions." (*In re Marriage of Drake* (2015) 241 Cal.App.4th 934, 939–940.)  "Accordingly, we look to see whether the court abused its discretion in applying the law.…" (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1542.)

As stated previously, where "the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals," "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528; *ibid.*)  "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Ibid.*)

"The appellate court cannot substitute its factual determinations for those of the trial court; it must view all factual matters most favorably to the prevailing party and in support of the judgment." (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) " ' "All conflicts, therefore, must be resolved in favor of the respondent." [Citation.]' " (*Ibid*.)

**C.     *Analysis***

The trial court found that appellants failed to establish by clear and convincing evidence that it would be in the best interests of the child to be adopted, and it also stated that neither the guardianship nor physical custody had reached two years at the time the adoption proceeding was filed.  The trial court acknowledged receipt of the appellants' amended petition, filed on October 23, 2020, at the beginning of the contested hearing, and it also referenced the amended petition in its ruling.[2]  However, the trial court repeatedly stated in its ruling that appellants did not establish an uninterrupted period of sole physical custody for two years prior to the filing of the petition requesting termination.

The relevant inquiry is whether appellants had sole legal and physical custody of the child for two years prior to the filing of the amended petition.  (See *Ann S.*, *supra*, 45 Cal.4th at p. 1132, fn. 13 ["We adopt the construction that avoids casting doubt on the statute's constitutional validity, and hold that physical and legal custody by the guardian for two years is required under [Probate Code] section 1516.5, subdivision (a)(2)"].)  The uncontradicted evidence establishes that appellants had uninterrupted, sole legal and

---

[2] If the trial court was only considering the time period prior to the filing of the original petition in June 2019, then it would be unable to consider any of Mother's progress or lack of visitation since she was released from incarceration in January 2020. However, the trial court clearly considered circumstances subsequent to the original petition when it discussed Mother's release from incarceration and completion of programs.

physical custody of Taylor from the granting of the guardianship on June 11, 2018, through the filing of the amended petition on October 23, 2020.

Therefore, even without considering the period of time that lapsed from the filing of the amended petition to the actual date of the contested hearing in February of 2021, appellants clearly satisfied the two-year requirement of Probate Code section 1516.5, subdivision (a)(2). The trial court's refusal to find in appellants' favor on the second prong was in error, however appellant must also demonstrate error as to the third prong of "benefit" to the child from adoption to require reversal.

As to the third prong of benefit to the child, appellants argue that the trial court's ruling was void of any analysis relating to the child's best interest, improperly focused on the absence of evidence that a bond did not exist between the child and parents and applied an unfitness standard. First, our focus is upon the ultimate decision rather than the underlying analysis of the trial court. (*In re Noreen G.*, *supra*, 181 Cal.App.4th at p. 1384.) " 'Our task is to determine whether the judgment should be affirmed or reversed. Thus, we review the judgment for reversible error, not merely to determine whether the trial court's interpretation … was correct, but whether the judgment is correct on any theory. [Citation.]' " (*As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 447–448.)

In the present case, Taylor lived with appellants and Mother for the first year and a half of his life. Mother then moved to Idaho with Taylor, but she requested that Jo. M. take care of the child while she was struggling with drugs after only five months. At the time of Taylor's second birthday, Mother returned to appellants' home for one month to help care for Taylor. Mother began using drugs again after this visit, and she called for weekly updates over the next six months. During her next in-person visit in January 2018, Mother came to appellants' home and stole valuable items from appellants, which led to her incarceration for 17 months.

14.

Mother agreed to appellants becoming the guardians of Taylor, and letters of guardianship were issued in June 2018. Mother wrote two letters to Taylor during her incarceration, but appellants did not allow her to speak with Taylor. A court order prevented Mother from speaking with appellants during this time, and Mother believed the order also prevented her from contacting Taylor. Appellants filed their original petition to terminate parental rights, a month before the child's fourth birthday, in June 2019. Appellants made the decision to adopt Taylor after he began calling them "mommy" and daddy." Jo. M. believed Taylor was attached to her and her husband and lacked a bond with his biological parents. Appellants provided for the child's needs on a full-time basis for all but six months of Taylor's life.

Upon Mother's release in January of 2020, appellants refused to allow contact between Mother and Taylor until she proved that she was stable. The investigative report prepared by the agency concluded that the parents had not established or maintained a parent-child relationship with Taylor. At the time of the contested hearing in February 2021, Taylor was five years old. Mother had no in-person contact with Taylor for over three years, and Father had no in-person contact in over four years.

The trial court began its written ruling by stating that the Probate Code section 1516.5 analysis involves "other factors" than the stability of the child's placement. The trial court then stated that it would examine the best interest factors set forth in the statute, such as "the relationship between the child and birth parent, the relationship between the child and the guardians, and the child and any siblings." It cited the lack of evidence that Mother had a poor relationship with the child when she had full custody, which was a period of five months in 2017 that ended due to Mother's struggle with drugs. The trial court found the relationship between Taylor and Mother did not become distant until after Mother spent 17 months in jail from June 2018 to January 2020, and it also contributed any "diminution in the relationship" between Mother and Taylor to the appellants' refusal to allow contact since Mother became incarcerated.

15.

The trial court concluded its analysis by noting that Mother had proven that she was not unfit to care for Taylor through her completion of programs after being released from incarceration. After finding appellants did not meet their burden that adoption would be in the best interest of the child at the time of the filing of the petition, it continued to place the blame for Mother's lack of contact since her incarceration on appellants. The trial court then declined to terminate parental rights based upon its perception that appellants prevented contact between Taylor and Mother since her incarceration. The trial court's ruling also incorporated language from a depublished Court of Appeal decision, *Guardianship of Ann S.* (2006) 41 Cal.Rptr. 3d 709, 713, review granted and opinion superseded sub nom. *In re Ann Marie S.* (2006) 47 Cal.Rptr.3d 777 and affirmed, *Ann S.*, *supra,* 45 Cal.4th 1110, regarding the existence of a rebuttable presumption of unfitness when discussing the factors it must consider.[3]

First, we note that the trial court's discussion of a rebuttable presumption of unfitness as a factor in the best interest analysis was incorrect. The California Supreme Court clarified that "nothing in the statute suggests that a showing of current parental fitness would necessarily bar a finding that adoption by the guardian would be in the child's best interest." (*Ann S.*, *supra*, 45 Cal.4th at p. 1133, fn. 15.) "The statute simply focuses on the child's best interest, in light of all relevant circumstances." (*Ibid.*) While a parent's fitness may be a factor in considering the child's best interest, the trial court may not refuse to apply Probate Code section 1516.5 based on the perceived existence of a presumption that would prevent termination of parental rights. Even accepting the trial court's incorrect analysis, we are still required to focus on the trial court's ultimate

---

[3] In reaching its decision, the California Supreme Court noted that the appellate court attempted to distinguish another case on the basis that section 1516.5 effectively incorporates a rebuttable presumption of unfitness. However, the Court stated, "nothing in the statute suggests that a showing of current parental fitness would necessarily bar a finding that adoption by the guardian would be in the child's best interest. The statute establishes no presumption, rebuttable or otherwise, with regard to parental fitness." (*Ann S.*, *supra*, 45 Cal. 4th 1110, at p. 1133.)

determination, and we will consider whether the failure to terminate parental rights was compelled as a matter of law.

Where the record affirmatively shows that the trial court misunderstood the proper scope of its discretion, a remand to the trial court normally is required to permit the court to exercise informed discretion with awareness of the full scope of its discretion and applicable law. (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 16; *People v. Rodriguez* (1998) 17 Cal.4th 253, 257.) Remand for the trial court to exercise discretion is not appropriate, however, if the record would not support a finding in the respondent's favor – that is, if the undisputed facts before the trial court compel a conclusion that adoption by the guardian is in the child's best interest. (*Guardianship of Kassandra H.* (1998) 64 Cal.App.4th 1228, 1240 [remand for trial court to exercise discretion is not appropriate where the Court of Appeal "can say with some confidence" that the record did not support a judgment for the respondent].)

The primary factors cited by the trial court in denying the petition was the child's relationship with Mother not becoming distant until her incarceration in June of 2018, an alleged interference with contact between Taylor and Mother since her incarceration, and Mother's completion of programs after her release from incarceration. We acknowledge that Mother's relationship with the child began to severely diminish once all contact ceased upon her incarceration, however, the relationship initially weakened when she requested that Taylor begin living with appellants in another state in May 2017. The relationship continued to diminish as Mother was struggling with drugs during the months leading up to her incarceration.

In addition, the uncontradicted evidence established that Mother was prohibited from contacting appellants and Taylor while she was incarcerated by an order from her criminal case. It was not the appellants' decision to deny visitation after mother's release from incarceration that led to the deterioration in Mother's relationship with Taylor. Instead, whatever bond Taylor had developed as an infant effectively ceased as result of

17.

her infrequent contact in the year prior to her incarceration. Therefore, it cannot be said that the appellants were to blame for the "diminution in the relationship" upon Mother's incarceration.

As discussed previously, Mother's demonstration that she was not "unfit to properly care for the child" through the completion of programs cannot act as a bar to the termination of parental rights. The progress that she made in addressing her past substance abuse may be considered in the context of the nature of Taylor's relationship with Mother. The only problem is that there was essentially no evidence proffered that any relationship existed between Taylor and Mother at the time of the hearing on the petition.

Probate Code section 1516.5 does not describe how a court considering a petition to terminate parental rights is to weigh the nature and extent of the birth parent-child relationship against the nature and extent of the guardian-child relationship, and we are not aware of any cases that shed light on the inquiry. However, courts have examined a comparable question in the dependency context under Welfare and Institutions Code section 366.26. That section provides that even after the parents have failed to reunify, parental rights should not be terminated if the court, considering the "best interests of the child," concludes that "the child would benefit from continuing the [parent-child] relationship." (Welf. & Inst. Code, § 366.26, subds. (c)(1)(B)(i), (h)(1).)

Relevant factors include the age of the child, the portion of the child's life spent in the parent's custody, the positive or negative effect of interaction between parent and child, and the child's particular needs. (*In re Caden C.* (2021) 11 Cal.5th 614, 632.) Courts must examine not simply the strength of the bond between the child and the birth parent, but whether that bond is "so significant and compelling in [the child's] life that the benefit of preserving it outweigh[s] the stability and benefits of adoption." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 396.)

18.

We acknowledge that the present petition is governed by the Probate and Family Codes, not the Welfare and Institutions Code, and it concerns a child who was voluntarily placed with his current guardians by a parent, not involuntarily placed by the state. Nevertheless, we find the balancing framework developed by the courts in the dependency context to be useful in applying the best interest test the Legislature has adopted in Probate Code section 1516.5. Balancing the benefits of maintaining the parent-child relationship against the benefits of permanency provided by adoption gives valuable guidance in evaluating the nature and extent of the child's respective relationships with their biological parent and guardians. We therefore will rely on this balancing framework in reviewing the trial court's decision and Taylor's best interest.

"The interests served by [Probate Code] section 1516.5 are substantial: affording children in probate guardianships the opportunity to enjoy permanent adoptive homes with familiar caretakers, and giving willing guardians the chance to become adoptive parents." (*Ann. S.*, *supra*, 45 Cal.4th at p. 1138.) "For young children and those children for whom adoptive parents are available, adoption is usually the preferred placement because it offers the prospect of a secure permanent home." (See *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 258.) "The reality is that childhood is brief; it does not wait while a parent rehabilitates himself or herself. The nurturing required must be given by someone, at the time the child needs it, not when the parent is ready to give it." (*In re Debra M.* (1987) 189 Cal.App.3d 1032, 1038.) "Children continue to develop, and the Legislature has appropriately determined a child needs a secure and stable home for that development." (*In re Daniel M.* (1993) 16 Cal.App.4th 878, 885.)

Taylor was clearly in need of the stability and permanency that adoption would provide. As discussed by the Supreme Court in *Ann S.*, *supra*, 45 Cal.4th at page 1125, one of the purposes of section 1516.5 is to cover situations " 'where a drug addicted mother gives the child in guardianship, hoping to get herself rehabilitated but repeatedly fail[s], creating a situation where the child is in the custody of the guardian for years

19.

without being in the foster care system.… [A] guardian should be able to adopt the child without having to obtain consent or prove neglect, abandonment, or the mental disorder or mental illness of the parent who gave them [*sic*] guardianship in the first place. [¶] Given the other avenues left available, the sponsor believes that creating this new provision applicable only under the limited circumstances would allow a child to remain in and be adopted into a loving home in which he or she has been living. Adoption would take away any fear that someday his or her birth parent or parents would come back to reclaim him or her.' " (*Ann S.*, at p. 1125, quoting Sen. Com. on Judiciary, Analysis of Sen. Bill No. 182 (2003–2004 Reg. Sess.) as amended Mar. 26, 2003, pp. 8–9.)

Taylor was five and a half years old at the time of the hearing. By that time, Taylor had not seen Mother in person in over three years, and he had been cared for by the appellants on a full-time basis since he was two years old. Prior to his second birthday, Mother provided full-time care for Taylor for only five months, and she previously shared caregiving responsibilities with appellants for the first year and a half of his life. Jo. M. testified that she did not believe there was ever a bond between Taylor and his mother. Taylor had begun calling appellants "mommy" and "daddy," and he was attached to them. The social worker's report concluded that Mother had not maintained a parent-child relationship with Taylor. Mother offered nothing to rebut appellants' evidence as to the nature and extent of Taylor's relationship with either herself or appellants.

At best, the evidence supported a conclusion that Mother had recently begun to address the circumstances that led to the establishment of the guardianship and demonstrate a commitment to her parental responsibilities by completing programs after her release from incarceration. Mother, however, did not present any evidence to rebut the overwhelming evidence that Taylor's only meaningful and established relationship

was with appellants. Mother's claims of recent self-improvement were substantially outweighed by Taylor's need for the secure and permanent attachment that he desired.

The trial court's analysis did not consider the benefits that adoption with appellants would provide to Taylor. Appellants were the only source of stability for Taylor in his almost six years of life. Taylor's own statements that he loved appellants and wanted to be with them provided additional evidence of the significant emotional bond that had developed over several years. Even prior to Mother's incarceration, her infrequent visits with Taylor were insufficient to maintain a significant parent-child relationship.

Faced with the evidence of a nonexistent bond between Taylor and Mother, the trial court should have appropriately weighed the benefits that would be provided to Taylor through an adoption with appellants, who provided him with the home he had lived in for the majority of his life. However, the trial court disregarded this vital factor. Having reviewed all the evidence before the trial court, we conclude that the evidence compelled the trial court to find that adoption by the appellants was in Taylor's best interest. Therefore, a remand for a further exercise in discretion by the trial court is not necessary.

## DISPOSITION

The order denying the petition to terminate parental rights is reversed with directions to the trial court to grant the petition. Appellants are awarded their appellate costs.

                                                            POOCHIGIAN, J.

WE CONCUR:


HILL, P. J.


PEÑA, J.