ELIZABETH H. LORD v. OLIVE S. HOUGH, ASA D.
NUDD, WILLIAM W. KNIGHT, AND C. J. NEW-
COMB

GUARDIANS AT COMMON LAW.—There were ·four kinds of guardians at common
     law : by nature, for nurture, in socage, and in chivalry..
TESTAMENTARY GUARDIANS.—Guardians in chivalry were abolished and testamentary.
     guardians substituted by Statute 12, Car. II, c. 24, and made to take pre-
     cedence of all other kinds of guardians.
IDEM.—Like all other guardians, the testamentary guardian was subject to the super-
     vision of the Court of Chancery, and could be removed for cause.
POWER OF THE COURT OF CHANCERY OVER GUARDIANS.—Guardians of all kinds
     are trustees, and for that reason were subject to the supervision and amenable to
     the orders of the Court of Chancery.
IDEM.—The power of the Court of Chancery over guardians is no greater than it
     is over other trustees, and it cannot therefore remove a guardian except for
     good cause shown or apprehended.
GUARDIANS BY THE STATUTE OF THIS STATE.—Under the statute of this State the
     power to appoint guardians is vested, first, in the father; second, in the mother;
     and third, in the Probate Court.
IDEM.—Under the statute of this State a testamentary guardian has only the powers
     of a probate guardian, and cannot, therefore, take the personal custody of

CAL. REPS. XXXVII—83

the ward so long as there is a mother who is competent, willing, and worthy to have the custody and tuition of her child.

IDEM.—If the father dies, having appointed a guardian for his children by his last will and testament, but leaving a widow who is a qualified and fit person to have the personal custody of her children, such widow is entitled, if she so desires, to the personal care and custody of the children. In such case the power of the testamentary guardian only extends to such special directions as the father may have given in his will with reference to the education and settlement of his children, and the care and management of their property, and does not include the personal custody of the children, if objection thereto be made by the mother.

IDEM.—L. being the father of three children, aged respectively eight, six, and four years, made his will, by which he devised the custody of his children to his mother in these words: "The personal care, custody, and control of my said children I do hereby confide to my dear mother, solely, except in such cases as my said trustees and executors may deem contrariwise for the purposes of education," and died, leaving a widow who was in all respects a fit and proper person to be intrusted with the personal care and custody of her children. In an action by the widow against the testamentary guardian and executors of L. for the custody of the children, it was held that, under the statute of this State, the widow's claim to the personal custody of the children was superior to that of the testamentary guardian.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The defendants appealed.

The facts are stated in the opinion of the Court.

*McRae & Rhodes*, for Appellants, made the following points:

1. By the statute law of this State the father has the power to appoint a guardian for his children by his last will and testament, and such guardian is entitled to the personal custody of his wards. (Stats. 1850, p. 268, Secs. 10, 7.)

2. Testamentary guardians take precedence of probate guardians. (*Wood* v. *Wood*, 5 Paige, 605; 2 Story's Equity, Sec. 1,338*a*; Tyler's Inf. 254, Sec. 171; North on Probate Courts, 262, note, 263.)

3. The Probate Courts of this State possess no power to appoint a guardian if there be a testamentary guardian. (Stats. 1850, p. 268, Sec. 1; *Norris* v. *Norris*, 15 Cal. 254; *Kendall* v. *Miller*, 9 Cal. 591.)

4. Testamentary guardians are not removable by the Probate Courts of this State.  (Tyler's Inf. 253.)

5. Testamentary guardians have been recognized by the civil law from the earliest times.  (Schmidt's Civ. L. 27; *Foster and Wife* v. *Allston*, 6 How., Miss., 406—opinion of Sharkey, C. J.)  And in England from the time of Charles II, and before.  (Tyler's Inf. 248, Sec. 170; 2 Kent's Com. 224; 2 Story's Equity, Sec. 1,338*a*, 1,340; *People* v. *Nickerson*, 19 Wend. 16; 1 Black. Com. 453.)

*Quint & Hardy*, for Respondent, conceded that under Statute 12, Car. II, c. 24, a testamentary guardian took precedence of all other guardians, and could therefore take the personal custody of the children from their mother, although in all respects a fit and proper person to be intrusted with their nurture and tuition; but contended that such was not the case under the statute of this State, and argued at length to show that the construction adopted by the Court in this case was the only proper construction to be given to the statute.


By the Court, SANDERSON, J.:

The plaintiff, being a widow and the mother of three children, aged respectively eight, six, and four years, sues the mother of her deceased husband and the executors of his last will and testament to obtain the personal custody and guardianship of her children.  The defendants defend upon the ground that Charles S. Lord, the deceased father of the children, by a provision found in his last will and testament, devised the personal custody of his children *solely* to his mother, the defendant, Olive S. Hough, in the following words: " The personal care, custody, and control of my said children I do hereby confide to my dear mother *solely*, except in such cases as my said trustees and executors may deem contrariwise for the purposes of education."   And, in connection, upon the further ground that the plaintiff is not

a suitable person to be intrusted with the personal custody and tuition of the children.

The case shows, as the Court below found—which finding we see no cause to disturb—that the plaintiff, and the defendant Olive S. Hough, are both, in all respects, qualified and fit persons to have the nurture and tuition of the children. The claim of the plaintiff, so far as it is to be considered by this. Court, is, therefore, founded solely upon her legal rights *as mother*, and the claim of the defendant Olive S. Hough solely upon her legal rights as *testamentary guardian.* The Court below reached the conclusion that the legal rights of the mother were superior to those of the testamentary guardian, and, therefore, rendered a judgment in favor of the plaintiff.

There were four kinds of guardians at common law, called respectively guardians *by nature*, guardians *for nurture*, guardians *in socage*, and guardians *in chivalry.* The guardians *by nature* were the father, and, in some cases, the mother of the children. Guardians *for nurture* were, also, the father or mother, and continued until the child attained the age of fourteen years. Guardianship *in socage* took place only when the infant was entitled to an estate in lands by descent, and the next of kin, to whom the estate could not possibly descend, became the guardian *in socage.* Guardianship in socage, like those for nurture, continued only until the infant was fourteen years of age, at which age he was presumed to have attained sufficient discretion and judgment to choose a guardian for himself, and, therefore, was allowed to do so, subject, however, to the approval of the Court of Chancery. Guardianship *in socage* included the custody and care of both the person and the estate of the infant. Guardianship *in chivalry* was a feature of the feudal system, and took place when lands came to an infant by descent, which were held by knight service. It continued until the infant attained the age of twenty-one years, if a male, and sixteen if a female, and related to both person and estate, without any obligation to account for the profits of the latter. (1 Blackst. Com., Chap. 17 ; 2 Blackst. Com., Chap. 5.) These

guardians were appointed or designated by the common law itself, except that the Chancellor, by virtue of his authority as representative of the King, who was the *parens patriæ*, and, as such, the guardian of all the infants in the kingdom, was allowed to appoint guardians to such infants as were without guardians by common law.

By statute, (12 Car. II, c. 24,) among other things, tenure by knight service and wardships in chivalry were abolished, and in view of this abolition of guardianship in chivalry, which continued until the full age of the ward, and in view, also, of the imbecility of judgment in children of the age of fourteen, (as we are told by Blackstone,) it was, by the same statute, further enacted "that where any person hath or shall have any child or children, under the age of one and twenty years, and not married at the time of his death, that it shall and may be lawful to and for the father of such child or children, whether born at the time of the decease of such father, or at that time *in ventre sa mere*, or whether such father be within the age of one and twenty years, or of full age by his deed, executed in his lifetime, or by his last will and testament in writing, in the presence of two or more credible witnesses, in such manner, and from time to time, as he shall respectively think fit, to dispose of the custody and tuition of such child or children, for and during such time as he or they shall respectively remain under the age of one and twenty years, or any lesser time, to any person or persons in possession or remainder, other than Popish recusants; and that such disposition of the custody of such child or children, made since the 24th of February, 1645, or hereafter to be made, *shall be good and effectual against all and every person or persons claiming the custody or tuition of such child or children as guardian in socage*, OR OTHERWISE. And that such person or persons, to whom the custody of such child or children hath been or shall be so disposed of or devised as aforesaid, shall and may maintain an action of ravishment of ward or trespass against any person or persons which shall wrongfully take away or detain such child or children,

for the recovery of such child or children; and shall and may recover damages for the same in the said action, for the use and benefit of such child or children.

"That such person or persons, to whom the custody of such child or children hath been or shall be so disposed or devised, shall and may take into his or their custody, to the use of such child or children, the profits of all lands, tenements, and hereditaments of such child or children; and also the custody, tuition, and management of the goods, chattels, and personal estate of such child or children, till their respective age of one and twenty years, or any lesser time, according to such disposition aforesaid; and may bring such action or actions in relation thereunto as by law a guardian in common socage might do." (Eng. Stats. at Large, 12 Cha. II to 7 and 8; Will. III, p. 27, Sec. 89.)

Although, as appears from the face of this statute, the practice of appointing testamentary guardians had previously prevailed to some extent, yet it had not then ripened into a custom of such duration as to make it a part of the common law; hence this statute is the source of the posthumous power of the father over the custody and tuition of his children. By this statute, the posthumous custody of his children was placed as absolutely at his disposal as his lands had been under the Statute of Wills of 32 Henry VIII. His power to devise his lands under the latter was not greater nor more complete than his power under the former to devise the custody and tuition of his children, for the testamentary guardian was endowed with all the powers of a guardian in socage, and his claims were expressly declared to be superior to all persons claiming the custody of the children as guardians, *or in any other capacity.* Under it, no power over or right to the custody or tuition of her children was recognized as existing in the mother; on the contrary, the power conferred upon the father was unqualified, and extended even to the child yet in its mother's womb. In this, however, the philosophy of the statute was not retrogressive; on the contrary, it was in exact accord with the barbarism of the com-

mon law, which endowed the husband with the wife's estate, and merged the existence of the mother in that of the father, or esteemed her of but little more consequence than the chief of his servants. To her the common law grudgingly accorded the reverence and respect of her children, but no power over them. (1 Black. Com. 453.)

While the testamentary guardian took precedence of all other persons in respect to the custody and tuition of his ward, and the care and management of his ward's estate, like all other guardians, he was but a trustee, and, for that reason, was, like them, subject to the general supervision and control of the Court of Chancery, even to the extent of removal, if found unfaithful to his trust. In the case of *Beaufort* v. *Betty*, 1 P. Will. 702, Lord Macclesfield said, with some warmth, "that testamentary guardians were but trustees, and that the statute, by enabling the father to devise the guardianship of his children, did no more than empower the father by will to choose a different person from him or her that would have been guardian in socage—a different person than what the law would have appointed—and to continue that guardianship to a different time than the guardianship in socage would have continued, viz: until twenty-one instead of fourteen. But that still a guardian appointed according to the statute had no more power than a guardian in socage; and as the Court could interpose where there was a guardianship in socage, so might it also do in case of a guardian by the statute, both being equally trustees; that, suppose one should devise *lands* to trustees to sell for such a price as they should think fit, for the payment of debts, there could be no doubt but that this Court, at the desire of any single creditor, might and would interpose, and order the estate not to be sold as the trustees should think fit, but for the *best price* before the *Master;* and as the Court would interpose where the estate of a man was devised in trust, so would it, *a fortiori*, concern itself in the custody of a child's being devised to a guardian, who was but a person *intrusted* in that case, since nothing could be of a greater concern

than the education of infants, and more especially of this noble lord, in whom the public was interested, and from whom his prince and country might justly have expectations;" and, accordingly, the Lord Chancellor further declared that he would not only interpose where the testamentary guardian had misbehaved, but he would also interpose where there was any reasonable ground to apprehend misbehavior, upon the principle that "*preventing justice* is to be preferred to *punishing justice.*"

The power of the Court of Chancery to direct, restrain, and control all guardians in the performance of their duties, whether they be appointed by the common law or by statute, and even to remove them and put others in their places, if they misbehave or purpose doing so, is settled beyond controversy. (*In the matter of Andrews*, 1 Johns. Ch. 109.) Guardians are but the lieutenants of the Chancellor. They exercise but a trust, and are, at all times, subject to the inquisition of the Chancellor, and amenable to his orders. But while the Court of Chancery has the control and superintendence of all guardians, however appointed, yet it can no more interpose in matters of guardianship, without cause, than it can interpose without cause in other matters which are within its jurisdiction. Chancery will not interfere and remove a guardian who has been legally appointed, unless for misbehavior. The guardian appointed by either the common law or statute has a legal right to the trust, of which he cannot be deprived except for reasons in equity. The discretion of the Chancellor, of which mention is frequently made in connection with his power of supervision and removal of guardians, is not an arbitrary or capricious, but a judicial discretion, to be exercised not in total disregard but with due regard to all the legal rights of all concerned; otherwise, it would be vain to provide by law that the father, or the person by him selected, shall have the guardianship of his child, for it would lie in the mouth of the Chancellor to say whether he should or not. To say that the father may devise the custody of his child, but the Chan-

cellor may, of his own motion, and without cause, turn the
devisee out of his trust, and put a person of his own selec-
tion in his place, is to say, in the same breath, that the father
and guardian has, and has not, a legal right, the one to devise
and the other to retain the custody of his child or ward.    In
no case, so far as we are advised, has the Court of Chancery
undertaken to interfere with a guardian, without assigning
therefor some reason in equity.    In the *Duke of Beaufort's
Case* it was contended that the Court could not interfere,
*until* the guardian had, *in fact*, abused his trust.    Although
this limitation upon the power of the Court was denied by
the Lord Chancellor, who remarked, as already stated, that
*preventive* was better than *punitive* justice, yet he added, "That
if any wrong steps had been taken, which might not deserve
punishment, yet, if they were such as induced the least sus-
picion of the infant's being like to suffer by the conduct of
the guardians, or if the guardians chose to make use of
methods that might turn to the prejudice of the infant, the
Court would interpose, and order the contrary, and that this
was *grounded upon the general power and jurisdiction which it
had over all trusts, and a guardianship was most plainly a trust.*"
It was not pretended that the Court held any *sovereign* power
in the premises, and the ground upon which its power was
placed (the ground that guardians are trustees) fully demon-
strates the character of the power to be judicial.

In view of the ground upon which it is founded it is obvi-
ous that the power of the Court in relation to guardianships
is not different from its power in relation to other trusts, and
that, like the latter, its exercise is to be governed by the
rules of equity; that is to say, by the *judicial*, and not the
*extra judicial* will of the Chancellor.    It follows that if the
law of England in the time of Charles II is the law of this
State, the custody of these children cannot be taken, upon
the facts of this case, from the guardian appointed by their
deceased father.

On the part of the appellant it is claimed that this English

statute in relation to testamentary guardians, passed more than two hundred years ago and reflecting upon its face all the harsher features of the ancient common law in relation to the rights of a woman *as wife and mother*, has been in substance and legal effect adopted in this State. It would be a little surprising if, under a Constitution which has disendowed the husband of the wife's estate and recognized her own property *as hers*, her marital bondage in relation to her children has been continued by the re-enactment of a rule of conduct which had its origin when social and civil life had attained a point but a little above the level of semi-barbarism—a rule which is now repugnant to every one's sense of natural right and the natural order and fitness of things. To admit that the right of the father to the custody and control of the children is superior to that of the mother, other things being equal, is well; for the admission is founded upon the rational probability that, all things considered, he is more competent, by reason of his greater experience and better judgment, to rear, educate and settle them in life; but to continue this power after death, and enable the father, through mere whim, caprice, or a worse motive, or, at least, without rational cause, as the Court below has found in this case, to add to the loss of a father the loss of a mother also —to deprive a mother of the nurture and tuition of those to whom her own pains and throes have given life, or, which is equally vicious, if not more so, to deprive infant children of the nurse which nature has provided for them in sickness, and of the guardian whose careful watchings and tender teachings in time of health, cannot come except from maternal love, is to convert children into goods and chattels, and to lower parental love and care to the level of animal instinct. A power so easily abused and so pregnant with mischief to mother and children ought not to be exercised, except in view of conditions, which, out of consideration for the literary, moral and religious education of the children, would justify a Court of Chancery in taking them from the mother's custody. Such a power is inconsistent with the

other rights of married women, under the Constitution and
laws of this State, and 'the statute, if such there be, by
which it is conferred, should be so modified as to reflect the
same rational views in respect to the rights of the mother
in relation to the custody of her children, which have been
declared in respect to her other rights.   In a country where
it is declared that the property of the wife, held by her at
the time of her marriage, shall not be by the act of marriage
forfeited to the use and benefit of her husband, but shall, as
before, continue hers, and further, that the property after-
ward acquired shall be the common property of both; it
would be anomalous to find that, *as mother*, her rights have
been left to the semi-barbarous rule of the common law, by
which she would be entitled to no power over her children,
but only to their reverence and respect.   We are glad to
find that we are able to avoid a result so anomalous by, as
we consider, a fair and reasonable construction of the statute
of this State in relation to the appointment of guardians.

The power of the father to appoint a guardian by his last
will and testament is granted by the tenth section of the
statute, which reads as follows: "The father of any child
who is a minor may, by his last will and testament, appoint
a guardian or guardians of such child, whether born before
or after the time of making such will, and in the case of the
death of the father, the mother of such child may in like
manner appoint a guardian or guardians if such child shall
not then have any legally appointed guardian; and every
testamentary guardian shall give bonds and qualify, and shall
have the same powers and perform the same duties *with
regard to the person* and estate of such minor as guardians
*appointed by the Probate Court*, except as far as the said powers
and duties may have been legally modified, enlarged or
changed by the will by which such guardian was appointed."

This statute, unlike the English statute, it will be observed,
does not, in terms, provide that the testamentary guardian
shall have the custody and tuition of the ward, or what shall
be his powers and duties in any respect, but provides that

his powers and duties shall be the same as if he had been appointed by the Probate Court, except so far as they may have been legally modified by will. It does not even declare for what time the testamentary guardian may be appointed. So, for the purpose of ascertaining the precise extent of his powers, we are referred to those portions of the statute which relate to the powers of guardians who are appointed by the Probate Court. But it is not necessary to look at length into that subject. The question we are to answer requires an investigation only as to one point, viz: under what circumstances is the personal custody and tuition of the ward given to the probate guardian? For, the powers of the testamentary guardian being the same, he may take the custody of the person and tuition of the ward when the probate guardian could have done so, and not otherwise. Upon this point the meaning of the statute is not so plain and obvious as it might have been made; yet, by comparing several sections one with the other, we consider its meaning to be that, in all cases where the appointment of a guardian shall appear necessary or convenient, the father shall be first in legal right; and if the father be deceased, the mother, while unmarried, if they be competent to transact their own business, and are not otherwise unsuitable; and that, if another be appointed, he is not entitled to the personal custody and tuition of the ward, so long as the latter has a father or mother living who is competent to care for and educate him, and is not otherwise unsuitable. These rules we deduce from the fifth and sixth sections of the statute, which read as follows:

"SECTION 5. The father of the minor, if living, and in case of his decease, the mother, while she remains unmarried, being themselves respectively competent to transact their own business, and not otherwise unsuitable, shall be entitled to the guardianship of the minor.

"SECTION 6. If the minor have *no father or mother* living and competent to have the custody and care of the education

of such minor, the guardian so appointed shall have the custody and tuition of his ward."

The rule here prescribed is according to the law of nature. It. selects the same guardians, if not otherwise unsuitable, which nature has appointed, and in the same order—the father first, and the mother next. If, from any cause, these cannot be had to act in respect to the infant's estate, they are still retained to serve as guardians by nature and for nurture; and only in the event that neither can be had for that purpose, is the personal custody of the minor delivered over to a stranger.

So the testamentary guardian, since he has only the powers of a probate guardian, cannot take the personal custody and tuition of the minor, so long as there is a mother who is competent, willing, and worthy to have the custody and tuition of her child. Or, in other words, the only effect of the tenth section is to give the appointment of a guardian— first to the father, second to the mother, and lastly to the Probate Court; for the powers of the guardian, by whomsoever appointed, are the same, except as modified in the case of the testamentary guardian, by the will by which he has been appointed, which exception obviously refers only to such special and lawful directions as the testator may see proper to give with reference to the education of the minor, his settlement in life, or the management of his estate, among which, for the reasons already stated, the taking of the personal custody and tuition of the minor from the mother, if competent and worthy, cannot be included.

Our conclusion is that the custody and tuition of wards is fixed by the statute, and that the rule of the statute cannot be annulled by the will of the father.

Judgment affirmed.