Filed 8/14/23  Conservatorship of S.J. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person and Estate of S.J.<br><br>S.J.,<br>　　　　Petitioner and Respondent,<br>v.<br>F.J.,<br>　　　　Objector and Appellant. | A164126<br><br>(Sonoma County<br>Super. Ct. No. SPR86097) |

S.J. is a 28-year-old woman who is developmentally disabled.  For several years, her mother F.J. (Mother) and father D.J. (Father) served as her co-conservators, and S.J. lived primarily with Mother.  In 2019, the Sonoma County Public Defender, on S.J.'s behalf, petitioned for an order removing the co-conservators and appointing a new conservator, on the grounds that Mother and Father could not agree on issues related to S.J.'s placement, to S.J.'s detriment.

In the course of a two-day evidentiary hearing, the court heard testimony from several witnesses, including Father (who believed it would be best for S.J. to live in "a quality independent living situation with peers where she could have friendships and relationships and quality staff"),

1

Mother (who believed it would be best for S.J. to continue to live in Mother's home, where S.J. had lived for several years), and two experts, one appointed by the court (who opined that it was in S.J.'s best interest to initiate a slow transition to living with a group home with three or four others), and one retained by Mother (who opined that it was in S.J.'s best interest to stay where she was). The court granted the petitions, based on its findings that Mother and Father had reached an impasse as to S.J.'s placement despite several years of effort to reach an agreement; that for S.J.'s sake a decision should be made; and that it was in S.J.'s best interest to remove Mother and Father as co-conservators and appoint a new conservator.

Most of Mother's arguments on appeal raise challenges to the quality of the evidence concerning the appropriate residence for S.J., in support of Mother's position that S.J. should remain in her current home.[1] But because the trial court made no order changing S.J.'s residence, we do not reach those arguments. The court's orders removed Mother and Father as conservators and appointed a new conservator, and that is all. We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

S.J. has been diagnosed with severe intellectual disability, cerebral palsy, and Pitt-Hopkins syndrome, a disorder characterized by developmental and intellectual delays. She communicates in simple one- to three-word sentences, and with gestures. Mother and Father have been divorced since 2001, when S.J. was about five years old. From 2001 to 2010, S.J. spent equal time at each parent's home, but since 2010 she has lived mostly with Mother.

---

[1] Father, who is not a party to this appeal, has filed an amicus brief in support of respondent.

2

A.      *Original Conservatorship Petition and Order*

In October 2013, Mother filed a petition to be appointed the limited conservator of the person and estate of S.J., then age 18.  In the petition, Mother declared that S.J. was developmentally disabled as defined in Probate Code section 1420 and required 24-hour assistance for her physical health, food, clothing, and shelter.[2]  Father filed an objection requesting that the court consider his petition for conservatorship or, alternatively, appoint him and Mother as co-conservators.

In 2014, Mother and Father stipulated to the court's appointment of Dr. Daniel Pickar as an expert to evaluate S.J. and determine what form of care and what care schedule would be in her best interest.  In a September 2014 report, Dr. Pickar recommended that Mother and Father have joint conservatorship, and joint physical custody, with Mother having a somewhat larger percentage of custodial time.  Dr. Pickar further recommended that between the ages of 22 and 24, but no later than 24, S.J. should "begin living in an independent assisted living situation."

In March 2015, Mother and Father attended a judicially supervised settlement conference at which they agreed to act as co-conservators.  A

---

[2] All statutory references are to the Probate Code unless otherwise stated.  The Probate Code defines a " '[d]evelopmental disability' " as "a disability that originates before an individual attains 18 years of age, continues, or can be expected to continue, indefinitely, and constitutes a substantial handicap for the individual."  (§ 1420.)  And the Probate Code provides that, "A limited conservator of the person, or of the estate, or both, may be appointed for a developmentally disabled adult.  A limited conservatorship may be utilized only as necessary to promote and protect the well-being of the individual, shall be designed to encourage the development of maximum self-reliance and independence of the individual, and shall be ordered only to the extent necessitated by the individual's proven mental and adaptive limitations."  (§ 1801, subd. (d).)

3

stipulation and order reciting their agreements was entered in September 2015, and a conservatorship order was issued in October 2015.  The stipulation reflects that Mother and Father agreed on the appointment of a parenting coordinator to assist in implementing the timeshare schedule they had adopted, to resolve disputes between them, and to assist the court investigator in conducting the reviews required by the Probate Code.  Mother and Father also agreed that neither of them would seek to change S.J.'s residence until she reached the age of 22, while recognizing that the court retained jurisdiction to change S.J.'s residence at any time upon a finding that such a change was in S.J.'s best interest.

B.      *Petition to Remove Co-Conservators*

In 2019, the Public Defender of Sonoma County, on S.J.'s behalf, filed petitions to remove Mother and Father as co-conservators and to appoint Aprille Rafidison, a professional fiduciary, as successor conservator.  Mother filed written objections to both petitions.

In an amended petition to remove the co-conservators, the public defender asserted that in 2014 Dr. Pickar recommended that S.J. should move into an assisted living placement no later than the age of 24; that S.J. had now turned 24; and that after almost two years of "negotiation and delay on this issue," Mother and Father could not agree on who should perform an evaluation as to her placement.  The amended petition further stated that the disagreement between Mother and Father concerning evaluation and placement "goes to the heart of what is in [S.J.'s] best interests going forward"; that further negotiation between Mother and Father would be futile; and that it was in S.J.'s best interest to remove them as co-conservators and appoint an objective third party as conservator.

4

C.  *Evidentiary Hearing*

An evidentiary hearing on the petitions was held on October 7 and 8, 2021.  S.J., as petitioner, was represented by the public defender.  Mother was represented by counsel, and Father was self-represented.

Dr. Lori Pandolfo, a clinical psychologist appointed by the court under Evidence Code section 730, testified that she was hired "to understand what is in the best interest of [S.J.] for her living situation both short and long term."  In preparing her report she reviewed prior reports regarding S.J.; consulted with three clinical psychologists with extensive experience in the field of developmental disabilities; interviewed Mother, Father, and people identified by them as knowing S.J. well; and interacted with S.J. in her office, in S.J.'s home, at Father's home, and in the community.  Dr. Pandolfo recommended that S.J. "initiate a slow transition to the community," based on her opinions that S.J.'s current situation was not tenable in the long term; that at present Mother and Father were capable of participating and providing feedback as to the type of community home that would be appropriate for S.J.; and that in her present situation S.J. was functioning below her potential in terms of her activities of daily living and general skill development, including with respect to toileting, taking medication, and making choices.  She recommended that S.J. transition from living in Mother's home to living in a home with three or four other individuals, and that S.J.'s family and the North Bay Regional Center (Regional Center) consider the options and choose a placement based on S.J.'s needs and preferences.  She observed that the paid staff who worked with S.J. did things for her rather than structuring things to teach S.J. or develop her independence.  She testified that a dramatic change in residence following the death or incapacity of Mother would be "much more detrimental" to S.J.'s

emotional well-being than a planned, careful transition to the community. She testified that given S.J.'s level of disability, the older she gets, the less capable she will be of developing independence and making a transition to a different residence. In her report, Dr. Pandolfo stated that she learned "[f]rom numerous sources" that Mother and Father have had "significant challenges communicating and agreeing on [S.J.'s] care," and that "usually there has not been compromise and decisions have needed to be made through litigation."

Dr. Jon Bathori, a clinical psychologist retained as an expert by Mother, testified that he was asked "to assess the situation of [S.J.]," and that in his opinion, S.J. was receiving the best possible care where she was and should not be moved from Mother's residence. In preparing his report he reviewed prior expert reports, including Dr. Pandolfo's; consulted with a colleague; interviewed mother; and saw S.J. over the internet with Mother for 30-45 minutes. Dr. Bathori testified that he "not infrequently" did assessments for placements when a person with cognitive issues has been supported by their family and the family dies or becomes incapacitated. He believed that families ought to have plans to address those situations, but most families did not. He testified that there was no need to plan a transition for S.J. because Mother said her plan is to keep S.J. at her home whether Mother is alive or not.

Father testified that he and Mother shared custody on a 50-50 basis, but recently S.J. had been unable to stay with him because of the pandemic and because his wife A.J., S.J.'s stepmother, was undergoing treatment that left her immune compromised. So Father would take S.J. out for lunch or dinner, usually on Sundays. Father testified that it was challenging for him to physically care for S.J. because he had a neuromuscular condition which

6

affects his extremities, and he prefers having a caregiver with him when he is with S.J. Father said he believed that the best living situation for S.J. would be a "quality independent living situation with peers where she could have friendships and relationships with quality staff," somewhere in Sonoma County, where Father and Mother both live. He testified he has held this belief since S.J. was in elementary school, when a teacher told him that S.J. would not catch up with her classmates, that S.J. would need help for the rest of her life, and that the teacher had believed S.J. would be better off in a group home based on the teacher's observation of situations with divorced parents, where the stress and strife between them would affect the child. Mother, however, was not in agreement. Father testified that Mother is generally cooperative when Father wants to see S.J., but he is not allowed to go inside Mother's house and see where and how S.J. lives. And he testified that although Mother generally kept him informed on S.J.'s day to day activities, she failed to provide him with notice of meetings and reports from the Regional Center. He believed that Mother had left S.J. with caregivers who are trained only to clean houses, which had the potential of harming S.J. He believed that S.J. needed to be living in a situation with round-the-clock quality support; that S.J. is capable of doing more than she currently does; that S.J. would benefit from being treated as an adult with special needs rather than as a child; that because S.J. enjoyed social interaction she would benefit from living with other girls or women on a routine basis; and that S.J. would benefit if both her parents could see her at any time without restrictions. He believed S.J. was aware of the conflict between her parents, which was reflected in her wanting to stay with him after visits rather than return home. Father also testified that he was concerned that Mother wanted to have S.J. live with her until Mother dies, and that upon Mother's

death there would be enormous stress on S.J., with the Regional Center taking over to place S.J. somewhere without "the same level of desire or care or responsibility" as S.J.'s family to make sure S.J. is in a "safe, quality, positive situation."

Mother testified that she is 71 years old and in good health. She is a registered physical therapist, with certification in hippotherapy, which is treatment that uses the movement of a horse to regulate the nervous system, and improve balance, coordination, and strength. She operates a facility focused on helping children and adults with physical, emotional, and learning disabilities through therapeutic riding. She testified that she encourages S.J. to make choices throughout the day, and that S.J. sometimes chooses what to wear and sometimes dresses herself. Over time, S.J.'s ability to speak and walk has improved. Mother testified she is working with SJ. on dressing herself and toileting, and that S.J. participates in a life skills program through the Regional Center five days a week, six hours a day. She testified that she believed S.J. was thriving and happy in her home, and that S.J. had freedom that she would not have in another setting. She testified that she was concerned about placing S.J. in a group home because she has worked in group homes as a physical therapist and is aware of high turnover of staff, the potential for abuse and neglect of residents, and the displacement of residents when a house is sold. And she did not believe S.J. would get the same level of attention as she does in Mother's home. Mother testified that she would not allow Father to come into her home because 21 years earlier, after the divorce, she had invited him to see where she was moving and she felt that Father was judging her, which made her uncomfortable. The only two occasions on which Mother offered to allow Father inside to see S.J.'s room was once when Father came with his mother and once a few months

before the trial when Mother offered to allow him in if he would drop the lawsuit.[3] Mother testified that she thought it would be "ideal" for her and Father to work out a defined plan for S.J.'s care in the event Mother becomes unable to care for S.J., but no such plan had been made. She wanted S.J. to continue to live at her house even after her death, and thought there were ways of arranging for that. Asked what she thought would happen when she was no longer alive to make payments on the house where she lived, she testified that she thought her estate and Father or Father's estate would have "input into [S.J.'s] care and disposition" and would "work that . . . out."

Danielle Gilardi, a marriage and family therapist, testified that she interned at Mother's therapeutic riding facility in 2011 and periodically watched S.J. as a caregiver from then until the start of the COVID pandemic, providing care during the day or evening, and once overnight. In the few years immediately preceding the pandemic, she would care for S.J. about once a month. She testified that Mother was "very able" to care for S.J., and provided S.J. a loving and structured environment, and that S.J.'s speech and social skills improved from 2011 to 2020.

Amanda Prestyly-Belka, a registered nurse specializing in pediatrics, works as a therapeutic riding instructor at Mother's facility. She testified that she regularly sees S.J. at the facility, and gives S.J. riding lessons and hippotherapy sessions. She stated that S.J. has an active social life in the community of people who come to the facility, and that S.J.'s social, speech, and physical skills have improved over the years. She believed that if S.J. was placed in the immediate area, she could still participate in the horse

---

[3] Father testified that when Mother made this offer, he explained that he was not bringing the suit.

9

facility programs, but thought that S.J. would miss the community she was accustomed to, and would not thrive as much as where she is now.

Dr. Lorna Catford, who had retired as the director of the psychology internship program at Sonoma State University, testified that she had supervised students who worked at Mother's therapeutic riding facility, and first met S.J. about 20 years ago. In recent years, she generally saw S.J. about six times a year. She testified that over the years she has observed S.J. interacting with people at Mother's home, at religious school classes (which were attended by S.J. and Dr. Catford's daughter), and at events around the county, and that she had observed S.J.'s social and physical abilities to have improved over time.

Christopher Dunham, a riding therapist who has been employed at Mother's therapeutic riding facility for five years, testified that he saw S.J. at the barn several times a week, that S.J. had good relationships with him and other staff and with volunteers at the barn, and that over the past few years he had observed improvements in S.J.'s language skills, social skills, and physical abilities, including her horse riding skills.

Father's wife, A.J., testified that she had been S.J.'s stepmother for 19 years, and had a close bond with her. For a number of years, S.J. lived in Father and A.J.'s home half the time, and A.J. regarded S.J. as her daughter. She characterized S.J. as an energetic, vibrant young woman with considerable emotional intelligence. She testified that S.J. was very sociable and "loves everybody." She testified that she felt S.J. needed round-the-clock assistance with things like dressing and toileting, but most important she needed supervision, because she does not know what is dangerous and what is not. A.J. believed it was important to make detailed plans for S.J. while she and Father and Mother were alive and well; she was concerned that there

were no contingency plans for Mother's death or incapacity; and she was troubled at the thought that S.J. might remain in Mother's home without Mother, and without any plans having been made for who would take care of her.

At the close of the hearing, the court stated that it envisioned three possible outcomes: the petitions could be denied, leaving Mother and Father as co-conservators, with no resolution as to placement; the petitions could be granted, removing both conservators and appointing a third-party professional fiduciary; or Mother and Father could remain co-conservators subject to an order to start a transition by a certain date and complete it, with frequent reports to the court on the status of the transition. The court took the matter under submission, and, as we shall see, ultimately chose the second option.

D.    *Orders and Appeal*

On October 22, 2021, the court issued a written judgment and orders granting the petitions.[4] At the outset, the court noted that Mother and Father "have done an outstanding job raising this young adult. They overcame many challenges, including interpersonal communication issues, to keep the best interest of [S.J.] as their focus." The court found that it was the strong recommendation of "[e]xperts serving in the field that have experience with [S.J.'s] disability" that S.J. should "be placed in the greater community after participating in a robust transition living plan."

The court then reviewed the expert testimony, stating that the court-appointed expert, Dr. Pandolfo, who had conducted "a very comprehensive and deep evaluation" recommended S.J. be placed in the greater community

_____

[4] In its order, the trial court incorrectly referred to D.J. as the petitioner.

11

after the execution of a "comprehensive transition living plan," and that the transition should begin without delay because delay could be detrimental to S.J.'s development and delay could also mean that S.J.'s parents could not "participate robustly" in the transition. The court also noted that in 2014 Dr. Pickar had suggested that S.J. undergo a transition living plan by the time she was 22.

The court acknowledged the testimony of Mother's expert, Dr. Bathori, who testified that S.J. "is fine where she lives and doing very well," but the court noted that Dr. Bathori did not conduct personal visits with anyone other than S.J. and Mother, which was by remote technology, and that he did not interview Father or others, nor observe S.J. in her daily activities.

The court found that Mother and Father had reached an impasse with regard to S.J.'s placement, with Father in favor of the recommendation that S.J. participate in a transition to a community setting and Mother opposed to it.[5] The court concluded, "It is time for a decision for [S.J.'s] sake. [¶] Upon

---

[5] The court's order stated that the Regional Center supported and recommended a transition to a community setting, but there is no evidence in the record to support this statement. The Regional Center had filed a report in response to the petition for appointment of a successor conservator, stating that it saw no reason why a successor limited conservator should not be appointed, and that it had no objection to the appointment of Rafidison as successor limited conservator, but there is no indication that it filed any report or opinion concerning S.J.'s placement, and there was no testimony at trial from any employee or representative of the Regional Center. Dr. Bathori testified that S.J.'s caseworker at the Regional Center told him that that the Regional Center "didn't want to offer anything by way of opinion that could get dragged into the conflict"; that the Regional Center "was quite happy where [S.J.'s] at and had no criticisms or complaints about" Mother; and that as a general matter the Regional Center was "happy to support parents having a child live in their home" and would "follow the lead of parents and their preferences."

hearing and reviewing all of the evidence in this matter, the Court finds that it is in the best interests of [S.J.] for the co-conservators of the limited conservatorship [to] be removed and that a new conservator of the limited conservatorship be appointed."

The court granted the petitions, removing Mother and Father as co-conservators and appointing Aprille Rafidison as successor conservator. Mother timely appealed.[6]

## DISCUSSION

A conservator may be removed by the court for any of several enumerated causes, and "[i]n any other case in which the court in its discretion determines that removal is in the best interests of the . . . conservatee." (§ 2650, subd. (j).) We review an order removing a conservator under section 2650 for abuse of discretion. (See *Guardianship of Davis* (1967) 253 Cal.App.2d 754, 761 [whether there is sufficient cause to remove a guardian "is a question of fact to be determined in the broad discretion of the trial judge, whose determination will not be disturbed except upon a showing of manifest abuse of discretion"].) We will not find an abuse of discretion unless "under all the evidence, viewed most favorably in support of the trial court's action, no judge could have reasonably reached the challenged result." (*Conservatorship of Scharles* (1991) 233 Cal.App.3d 1334, 1340.)

---

[6] We took under submission for decision with the merits, and now deny, Mother's request that the record on appeal be augmented to include a "Determination of Conservatee's Appropriate Level of Care," signed by Aprille Rafidison on August 3, 2022, more than nine months after entry of the order challenged in this appeal. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 ["[a]ugmentation does not function to supplement the record with materials not before the trial court" at the time the challenged judgment or order was entered].)

On appeal, Mother argues at length that the trial court erred in finding that S.J. "should be removed from her personal residence and lifestyle and placed in the greater community." We do not address those arguments, because the trial court made no such finding. Although the court's order discussed the experts' recommendations concerning whether S.J. should transition to living in the broader community, and discounted Dr. Bathori's recommendation as being based on limited observations, the court did not find that S.J. should be removed from her current residence, nor did the court make any orders concerning a transition plan. And in its December 6, 2021 order appointing Rafidison as successor conservator of the limited conservatorship of the person and estate of S.J., the court granted Rafidison the power to fix S.J.'s residence or specific dwelling, without any limitation or requirement regarding a transition from Mother's home. We view the trial court's discussion of the expert opinions as providing support for its finding that it was in S.J.'s best interest for a decision to be made about her placement and that a third-party successor conservator, rather than Mother and Father, should make the decision.

As to the actual issue before us, which is the removal of Mother and Father as co-conservators, Mother argues briefly that the record does not support a finding by clear and convincing evidence that she should be removed as conservator. We do not find this persuasive. First, Mother provides no authority to suggest that the clear and convincing standard of proof has any bearing on the question whether to remove a conservator.[7]

---

[7] In her briefs, Mother states that the presumption that the conservatee's personal residence is the least restrictive appropriate residence must be overcome by clear and convincing evidence, as set forth in section 2352.5, subdivision (a). Section 2352.5, subdivision (a), does not apply in this

Second, the argument rests on an incorrect premise. Mother contends that she was removed as conservator because she believes it is in S.J.'s best interest to remain where she is, arguing that she should be S.J.'s sole conservator so that S.J. can "maintain her current personal residence and lifestyle." Mother disregards the fact that both she *and Father* were removed as conservators, and that they were removed because they could not agree on a fundamental issue concerning the well-being of S.J., namely, on where she should reside. The significance of Mother's belief concerning S.J.'s placement is that her belief is irreconcilable with Father's belief that S.J. should transition to an assisted living facility, and that after years of negotiation, Mother and Father could not reach an agreement.

In arguing that she should be S.J.'s sole conservator and that her wishes as to S.J.'s placement should prevail, Mother does not dispute that she and Father have reached an impasse on the issue of S.J.'s placement after years of discussion and negotiation. And Mother does not dispute that it is in S.J.'s best interest that there should be a resolution to the impasse: it is Mother's position that the resolution should be that her view prevails. In her briefs on appeal, Mother does not dispute the trial court's finding that there is an impasse that requires a resolution, nor does she dispute that there is ample evidence to support that finding, on which the court based its decision. We see no basis to find that the trial court abused its discretion in removing co-conservators and appointing a successor conservator, where, as here, there is a long-standing and irreconcilable disagreement between the co-conservators on a fundamental issue affecting the conservatee's well-being.

---

appeal because, as we have explained, the trial court did not order any change in S.J.'s residence.

**DISPOSITION**

The challenged orders are affirmed. Respondent shall recover any costs on appeal.

_____
Miller, J.

WE CONCUR:


_____
Richman, Acting P.J.


_____
Markman, J.[*]


A164126, *S.J v. F.J./Conservatorship of S.J.*

_____

[*] Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17